# 23-30

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DEBRA A. VITAGLIANO

*Plaintiff-Appellant,*

v.

COUNTY OF WESTCHESTER,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of New York (Halpern, *J.*), No. 7:22-cv-9370

## PLAINTIFF-APPELLANT'S OPENING BRIEF

Mark L. Rienzi
Joseph C. Davis
Daniel L. Chen
Daniel M. Vitagliano*
THE BECKET FUND
  FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*mrienzi@becketlaw.org*

*Not admitted to the D.C. bar; admitted to
the N.Y. bar; supervised by licensed D.C.
bar members

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATEMENT OF ISSUES ................................................................. 4

STATEMENT OF THE CASE ............................................................ 4

A. Factual Background ...................................................................... 5

    1. Plaintiff and her pro-life activities .......................................... 5

    2. Plaintiff's intent to engage in sidewalk counseling ................. 6

    3. The County's law banning sidewalk counseling ..................... 8

    4. The Sidewalk Counseling Ban's impact on Plaintiff ............. 10

B. Proceedings below ........................................................................ 12

SUMMARY OF THE ARGUMENT ..................................................... 14

STANDARD OF REVIEW ................................................................. 18

ARGUMENT ................................................................................... 19

I. Plaintiff has standing to challenge the Sidewalk
Counseling Ban .............................................................................. 19

    A. Plaintiff has established pre-enforcement injury in fact .............. 19

    B. The district court's injury-in-fact conclusion was erroneous. ....... 25

    C. Plaintiff has established causation and redressability. ............... 32

II. The Sidewalk Counseling Ban violates the First Amendment .......... 33

    A. *Hill* applies here. ................................................................. 34

B. *Hill* was wrongly decided, is irreconcilable with
   intervening precedent, and should be overruled by the
   Supreme Court. ................................................................................ 35

   1. *Hill* was wrongly decided. ......................................................... 36

   2. *Hill* is irreconcilable with intervening precedent. .................... 40

   3. *Hill* is ripe for overruling. ......................................................... 44

C. Under a proper First Amendment analysis, the
   Sidewalk Counseling Ban is unconstitutional. .............................. 46

   1. The Sidewalk Counseling Ban is content based. ...................... 46

   2. The Sidewalk Counseling Ban cannot survive strict,
      or even intermediate, scrutiny. .................................................. 49

   3. History and tradition confirm that the Sidewalk
      Counseling Ban is unlawful. ....................................................... 55

CONCLUSION ........................................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................................ 58

CERTIFICATE OF SERVICE ................................................................. 59

STATUTORY ADDEMDUM ................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  6 F.4th 1160 (10th Cir. 2021) ........................................................ 30, 32

*Agostini v. Felton,*
  521 U.S. 203 (1997) .............................................................................. 35

*Allco Fin. Ltd. v. Klee,*
  861 F.3d 82 (2d Cir. 2017) ................................................................... 18

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) .............................................................................. 28

*Boos v. Barry,*
  485 U.S. 312 (1988) .............................................................................. 38

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) .............................................................................. 49

*Carter v. HealthPort Techs., LLC,*
  822 F.3d 47 (2d Cir. 2016) ................................................................... 18

*Cayuga Nation v. Tanner,*
  824 F.3d 321 (2d Cir. 2016) ........................................ 21-22, 23, 28, 33

*Centro de la Comunidad Hispana de Locust Valley*
  *v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ......................................................... *passim*

*City of Austin v. Reagan Nat'l Advertising*
  *of Austin, LLC,*
  142 S. Ct. 1464 (2022) .............................................................. 45, 55, 56

*Davis v. FEC,*
  554 U.S. 724 (2009) ......................................................................... 27-28

*Dobbs v. Jackson Women's Health Org.,*
  142 S. Ct. 2228 (2022) ................................................................. *passim*

*Edwards v. City of Santa Barbara,*
150 F.3d 1213 (9th Cir. 1998) ............................................................. 56

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ............................................................. 38

*FEC v. Cruz,*
142 S. Ct. 1638 (2022) ............................................................. 19, 32-33

*Goe v. Zucker,*
43 F.4th 19 (2d Cir. 2022) ............................................................. 24

*Hill v. Colorado,*
530 U.S. 703 (2000) ...................................................... *passim*

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ............................................................. 24, 28

*Hulinsky v. County of Westchester,*
No. 7:22-cv-6950 (S.D.N.Y. 2023) ............................................................. 29, 51-52

*Int'l Code Council, Inc. v. UpCodes Inc.,*
43 F.4th 46 (2d Cir. 2022) ............................................................. 19

*Italian Colors Rest. v. Becerra,*
878 F.3d 1165 (9th Cir. 2018) ............................................................. 28-29

*John v. Whole Foods Mkt. Grp., Inc.,*
858 F.3d 732 (2d Cir. 2017) ............................................................. 29

*Knife Rights, Inc. v. Vance,*
802 F.3d 377 (2d Cir. 2015) ............................................................. 25

*Kounitz v. Slaaten,*
901 F. Supp. 650 (S.D.N.Y. 1995) ............................................................. 31

*Long Island Gynecological Servs., P.C. v. Murphy,*
298 A.D.2d 504, 74 N.Y.S.2d 776 (2d Dep't 2002) ............................................................. 53

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................. 29

*Majors v. Abell,*
    317 F.3d 719 (7th Cir. 2003) .............................................................. 20

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................ *passim*

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ........................................................................ 35

*Melendez v. Sirius XM Radio, Inc.,*
    50 F.4th 294 (2d Cir. 2022) ............................................................ 18

*N.Y. State Nat'l Org. for Women v. Terry,*
    886 F.2d 1339 (2d Cir. 1989) .......................................................... 21

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................ 39

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018) .......................................................... 49, 52, 53

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) ..................................................... 20-21, 31

*New York v. Griepp,*
    991 F.3d 81 (2d Cir. 2021) .......................................................... 43-44

*Palmer v. Amazon.com, Inc.,*
    51 F.4th 491 (2d Cir. 2022) ............................................................ 18

*Peck v. McCann,*
    43 F.4th 1116 (10th Cir. 2022) .................................................... 27, 28

*Picard v. Magliano,*
    42 F.4th 89 (2d Cir. 2022) ............................................. 20, 21, 25, 28

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) .................................................................... 35-36

*Price v. City of Chicago,*
    915 F.3d 1107 (7th Cir. 2019) ................................................... *passim*

vi

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ............................................................ 36

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ..................................................... *passim*

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988) ............................................................ 50

*Sabelko v. City of Phoenix,*
120 F.3d 161 (9th Cir. 1997) ............................................. 56

*Sable Commc'ns. of Cal., Inc. v. FCC,*
492 U.S. 115 (1989) ............................................................ 36

*Schenck v. Pro-Choice Network of W. N.Y.,*
519 U.S. 357 (1997) ........................................................ 38-39

*Simon & Schuster, Inc. v. Members of the*
*N.Y. State Crime Victims Bd.,*
502 U.S. 105 (1991) ............................................................ 37

*Sisters for Life, Inc. v. Louisville-Jefferson County,*
56 F.4th 400 (6th Cir. 2022) .............................................. 43

*SisterSong Women of Color Reprod. Just. Collective v.*
*Governor of Ga.,*
40 F.4th 1320 (11th Cir. 2022) ..................................... 44-45

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020) ............................................. 28

*Steffel v. Thompson,*
415 U.S. 452 (1974) ............................................................ 28

*Stenberg v. Carhart,*
530 U.S. 914 (2000) ............................................................ 16

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ..................................................... *passim*

vii

*Telescope Media Group v. Lucero*,
  936 F.3d 740 (8th Cir. 2019)................................................................ 32

*Turco v. City of Englewood*,
  935 F.3d 155 (3d Cir. 2019) ............................................................... 44

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ................................................................... 36, 37

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019) ................................................................ 23

*United States v. Grace*,
  461 U.S. 171 (1983) ........................................................................ 55

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ................................................................... 49, 53

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) ...................................................................... 33

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ........................................................................ 23

*Vitagliano v. County of Westchester*,
  No. 7:22-cv-9370, 2023 WL 24246 (S.D.N.Y. Jan. 3, 2023) .................. 4

*Vt. Right to Life Comm., Inc. v. Sorrell*,
  221 F.3d 376 (2d Cir. 2000) .......................................................... 15, 20

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................ 36

*Yamashita v. Scholastic Inc.*,
  936 F.3d 98 (2d Cir. 2019) ................................................................. 5

**Statutes**

18 U.S.C. § 248............................................................................... 51

28 U.S.C. § 1291.............................................................................. 3

28 U.S.C. § 1331...................................................................... 3

28 U.S.C. § 1343...................................................................... 3

42 U.S.C. § 1983...................................................................... 3

Charleston, W.V., Code § 78-235 (2019) ................................. 56

Chi., Ill., Code § 8-4-010 (2009)............................................ 56

Colo. Rev. Stat. § 18-9-122 .................................................... 34

Mont. Code Ann. § 45-8-110 .................................................. 56

N.Y. Penal Law § 120.00 ........................................................ 53

N.Y. Penal Law § 140.10 .....................................................52-53

N.Y. Penal Law § 240.20 ........................................................ 53

N.Y. Penal Law § 240.25 ........................................................ 53

N.Y. Penal Law § 240.26 ........................................................ 53

N.Y. Penal Law § 240.70 ........................................................ 51

Reproductive Health Care Facilities Access Act,
　　Laws of Westchester County §§ 425 *et seq.*................................ *passim*

## Other Authorities

M. Antonia Biggs et al., *Understanding Why Women Seek
　　Abortions in the US*, BMC Women's Health 13:29 (2013) ................. 6

Board of Legislators Meeting Agenda (June 27, 2022)..................... 34, 53

*Boulder Passes Abortion 'Buffer-Zone' Law,*
　　AP News (Oct. 22, 1986) ..................................................... 56

Alan K. Chen, *Statutory Speech Bubbles, First Amendment
　　Overbreadth, and Improper Legislative Purpose,*
　　38 Harv. C.R.-C.L. L. Rev. 31 (2003)................................... 39

Catechism of the Catholic Church ............................................................. 5

*Coronavirus Disease 2019 (COVID-19)*,
   Westchester Cnty. Dep't of Health ...................................................... 50

Richard H. Fallon, Jr., *Strict Judicial Scrutiny*,
   54 UCLA L. Rev. 1267 (2007) ............................................................ 40

Fed. R. App. P. 4 ..................................................................................... 3

Lawrence B. Finer et al., *Reasons U.S. Women Have
   Abortions: Quantitative and Qualitative Perspectives*,
   37 Persps. on Sexual & Reprod. Health 110 (2005) ........................... 6

Joint Meeting of the Westchester County Legislature
   Committees on Health and Legislation (June 1, 2022) ........... 24, 45-46

Colloquium, *Professor Michael W. McConnell's Response*,
   28 Pepp. L. Rev. 747 (2001) .............................................................. 39

Mike Randall, *Anti-Abortion Activists Sentenced for
   Trespassing at White Plains Medical Facility*,
   Lohud (Aug. 3, 2022) ........................................................................ 54

Matt Spillane, *Men with Red Rose Rescue Found Guilty of
   Trespassing at White Plains Abortion Clinic*,
   Lohud (Mar. 18, 2022) ...................................................................... 54

Dave Zucker, *More Westchester Communities Have Been
   Designated COVID-19 Micro-Clusters*,
   Westchester Magazine (Nov. 19, 2020) .............................................. 50

# INTRODUCTION

If the right to free speech includes anything, it includes the right to engage in peaceful, face-to-face conversations on important matters in a public forum. Yet that is exactly what Westchester County has banned—prohibiting citizens from approaching others in public fora near abortion clinics to peacefully offer information about alternatives to abortion, unless they first obtain consent.

Plaintiff Debra Vitagliano is a Westchester County resident who believes in the dignity of all human life, including the unborn. She seeks to engage in sidewalk counseling outside a White Plains abortion clinic—that is, to stand on the public way, approach women entering the clinic, and initiate gentle, compassionate conversation about the woman's situation and available resources should she choose to carry her child to term.

Yet Westchester County does not want women to have this final opportunity to make a more informed decision. In June 2022, the County passed a new law making it illegal, within 100 feet of an abortion clinic, to "knowingly approach another person within" eight feet "for the purpose of passing any material" or "engaging in oral protest, education, or counseling," "unless such other person consents." Under this provision, a paradigmatic example of First Amendment activity—walking up to a fellow citizen in a public place and engaging with her on an issue of public concern—is a crime punishable by jail time.

1

If this Court were writing on a clean slate, the verdict would be clear: this provision violates the First Amendment. The County's ban undeniably regulates speech based on its content, permitting approaches to engage in speech involving some content—but not "protest, education, or counseling." And the provision is not even related to, much less necessary for, maintaining clinic access or avoiding violence, given the numerous other tools in the County's toolbox for directly promoting those ends, many of which appear in other subsections of the same law.

Unfortunately, this Court is not writing on a clean slate: twenty-three years ago, a divided Supreme Court upheld a materially identical law in *Hill v. Colorado*, 530 U.S. 703 (2000). But *Hill* was an aberration at the time and is irreconcilable with intervening cases. A majority of the Supreme Court recently described it as a "distort[ion]" of "First Amendment doctrines." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2276 & n.65 (2022). Even the County knows *Hill* is on unsure footing, passing the law here only after the County Attorney warned that "hopefully our legislation never gets to the Supreme Court" because "we know what the Supreme Court would rule."

Plaintiff filed this case to vindicate her rights and right *Hill*'s wrong. In granting the County's motion to dismiss, the district court correctly recognized that *Hill* controls. But it introduced a wrinkle, *sua sponte* holding that Plaintiff lacked standing.

The district court's standing holding was erroneous. Plaintiff's complaint unambiguously alleges "an intention to engage in" prohibited sidewalk counseling—which is all Article III requires. Indeed, Plaintiff has expended significant resources learning how to engage in effective sidewalk counseling, completing multiple training classes and becoming a volunteer as a life consultant at a crisis pregnancy center. Plaintiff has identified in painstaking detail the way in which she intends to sidewalk counsel, including specific language she intends to employ. And she has further alleged that she is "[n]ow … prepared to engage in sidewalk counseling" and that she would do so "[b]ut for" the County's law. Under settled precedent, that more than suffices.

This Court should reverse the district court's standing holding. On the merits, this Court, like the district court, is bound by *Hill*. But under a proper First Amendment analysis, the County's law is unconstitutional.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First Amendment and 42 U.S.C. § 1983. The district court erred in holding that Plaintiff's complaint failed to establish Article III standing.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court issued an opinion and final judgment dismissing Plaintiff's complaint on January 3, 2023. App.36-44. Plaintiff noticed this appeal the next day. App.45; *see* Fed. R. App. P. 4(a)(1)(A).

3

## STATEMENT OF THE ISSUES

I.  Whether Plaintiff possesses Article III standing to bring this pre-enforcement action challenging the constitutionality of Westchester County's ban on sidewalk counseling.

II. Whether Westchester County's ban on sidewalk counseling violates the First Amendment as a content-based restriction on speech that cannot satisfy strict, or even intermediate, scrutiny.

## STATEMENT OF THE CASE

This appeal arises from a pre-enforcement First Amendment challenge to a provision of a recently enacted Westchester County law that prohibits sidewalk counseling outside abortion clinics. The district court dismissed the complaint on two grounds, under Rules 12(b)(1) and (6). *Vitagliano v. County of Westchester*, No. 7:22-cv-9370, 2023 WL 24246 (S.D.N.Y. Jan. 3, 2023) (Halpern, *J.*). First, the district court *sua sponte* determined that Plaintiff's complaint fails to establish Article III standing. App.39-40. Second, the district court held that Plaintiff's claims fail as a matter of law under *Hill*. App.41-42.

4

## A. Factual background[1]

### 1. Plaintiff and her pro-life activities

Plaintiff Debra Vitagliano is a sixty-four-year-old mother of three. App.4 ¶16. She has worked as an occupational therapist, primarily with special needs children, for forty-two years. App.4 ¶¶17-18. Her work has led her to recognize the inherent worth and dignity of all people, no matter their level of functioning. App.5 ¶19.

Debra is a devout, practicing Catholic. App.5 ¶20. Consistent with her Catholic faith, Debra opposes the practice of abortion, believing it is the deliberate taking of innocent human life. App.5 ¶¶21-22; *see* Catechism of the Catholic Church ¶¶ 2270-71. Two years ago, Debra felt called spiritually to live out her faith by getting involved in the pro-life movement. App.5 ¶23.

In February 2021, Debra began participating in a peaceful prayer vigil at the Planned Parenthood abortion clinic in White Plains, New York. App.5 ¶24. As part of the vigil, she would stand and pray on the sidewalk and public way outside the clinic. App.6 ¶26. Debra observed other participants engage in sidewalk counseling, approaching women on their way into the clinic, speaking with them about their pregnancies, and distributing pamphlets. App.6 ¶27.

---

[1] Because this appeal arises from the grant of a motion to dismiss, the facts are taken from Plaintiff's complaint and must be accepted as true. *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 100 n.2 (2d Cir. 2019) (per curiam).

Debra felt called to engage in sidewalk counseling. App.6 ¶28. She feels women who seek abortions are often not fully informed of the procedure and their options. App.6 ¶28. She views sidewalk counseling as a final attempt to change pregnant women's hearts and to save innocent unborn lives. App.6 ¶28. She wants to educate women, inform them of their alternatives to abortion, and advise them of resources available to them if they carry their babies to term. App.6 ¶28.[2]

## 2. Plaintiff's intent to engage in sidewalk counseling

Debra did not immediately engage in sidewalk counseling because she felt she first needed proper training. App.6 ¶29. She wanted to learn techniques for approaching pregnant women, what to say to them, and how to respond to different circumstances she might encounter. App.6 ¶29.

So Debra obtained that training—rendering her now fully prepared to engage in sidewalk counseling and effectively help women in need. App.7 ¶35. She first completed multiple online classes on counseling pregnant

---

[2] Academic studies show that many women seek abortions for reasons that may make them receptive to information about alternatives and resources available to them. *See, e.g.*, Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Persps. on Sexual & Reprod. Health 110, 113 (2005) (reasons given for abortion: "Can't afford a baby now," 73%; "Don't want to be a single mother or having relationship problems," 48%; "Husband or partner wants me to have an abortion," 14%); M. Antonia Biggs et al., *Understanding Why Women Seek Abortions in the US*, BMC Women's Health 13:29, at 5-6 (2013) (reasons given for abortion: "Financial reasons," 40%; "Not the right time for a baby," 36%; "Partner-related reasons," 31%).

6

women who are considering abortion. App.7 ¶30. She planned to use the knowledge she gained in these classes to engage in sidewalk counseling. App.7 ¶30. In spring 2022, Debra requested and received pamphlets from local organizers, which she planned to distribute while sidewalk counseling. App.7 ¶31.

Debra then started volunteering as a "life consultant" at a local crisis pregnancy center. App.7 ¶32. Life consultants meet with women experiencing unplanned pregnancies and discuss their options and available resources. App.7 ¶32. Debra first shadowed life consultants in their meetings with pregnant women so she could see the training she received in her classes put into action. App.7 ¶33. Debra now volunteers as a life consultant on a weekly basis. App.7 ¶34.

These classes and experiences properly trained Debra to engage in sidewalk counseling. App.7 ¶35.  She is "[n]ow … prepared to engage in sidewalk counseling" and "would" do so "[b]ut for" the County's law at issue in this litigation. App.7 ¶35; App.15 ¶65.

Debra seeks to counsel pregnant women on the public way as they approach the White Plains Planned Parenthood. App.7 ¶35. Consistent with her training, Debra would explore the details of each woman's story and pregnancy through active listening. App.7-8 ¶36. She would seek to learn what is leading the woman to consider abortion, asking about her needs and the attitudes and responses of her family, friends, and the child's father. App.7-8 ¶¶36-37.

7

The complaint explains how Debra intends to initiate conversation by saying, "You are not alone. We can help you" (or words to similar effect). App.8 ¶37. She would inform the woman that there are people who will love and care for her and her child. App.8 ¶37. Next, Debra would share with the woman information about other options to consider. App.9 ¶40. Drawing on her experience as a mother (and, if appropriate, as an occupational therapist), she would seek to offer the woman a vision for a fuller life with her child. App.9 ¶¶40-41. Debra would then offer the woman a pamphlet containing information for resources available to her if she carries her child to term. App.9 ¶42.

After Debra had begun her training and acquired pamphlets from local organizers, but before she could begin sidewalk counseling outside the White Plains Planned Parenthood, Westchester County passed a law that prohibits her intended sidewalk-counseling ministry. App.9 ¶43.

### 3. The County's law banning sidewalk counseling

In June 2022, Westchester County enacted the Reproductive Health Care Facilities Access Act (the "Act"). Laws of Westchester County §§ 425 *et seq.*; *see infra* Addendum. The purpose of the Act is to "prohibit interference with accessing reproductive health care facilities and obtaining reproductive health care services." *Id.* § 425.11.

Section 425.31(*i*) of the Act (the "Sidewalk Counseling Ban") makes it unlawful for any person to

knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility.

*Id.* § 425.31(*i*). "Approach" is defined as "to move nearer in distance to someone." *Id.* § 425.21(a). "Eight (8) feet" is "measured from the part of a person's body that is nearest to the closest part of another person's body, where the term 'body' includes any natural or artificial extension of a person, including, but not limited to, an outstretched arm." *Id.* § 425.21(b). And "reproductive health care facility" is defined as "any building, structure, or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide reproductive health care services," with "reproductive health care services" in turn defined to include "services relating to pregnancy or the termination of a pregnancy." *Id.* § 425.21(k)-(l).

Violations of the Sidewalk Counseling Ban are criminal misdemeanors punishable by fines and imprisonment. *Id.* § 425.41. A first conviction is punishable by a fine up to $1,000 and imprisonment up to six months; a second and each subsequent conviction is punishable by a fine up to $5,000 and imprisonment up to one year. *Id.* In addition, the Act provides for civil enforcement actions for injunctive relief by the County Attorney. *Id.* § 425.61. It also provides for private civil actions for treble damages

by "any person whose ability to access the premise of [an abortion clinic] has been interfered with," or by "any" "owner," "operator," "employee," "volunteer," and "invitee" of the abortion clinic. *Id.* § 425.51.

In addition to the Sidewalk Counseling Ban, the Act includes eight other restrictions on activities near abortion clinics, none challenged here. These other restrictions prohibit, *inter alia*, obstructing access; violence and any other unwanted physical contact; following and harassing; threats and intimidation; and "interfer[ing] with" (or attempting to interfere with) an abortion clinic's operations. *Id.* § 425.31(a)-(h). The Act is set out verbatim in the Addendum below.

### 4. The Sidewalk Counseling Ban's impact on Plaintiff

The Sidewalk Counseling Ban prohibits Debra's intended sidewalk-counseling ministry. App.11 ¶50. Her intended ministry requires initiating conversations when women are approaching the clinic. App.11 ¶51. But the Sidewalk Counseling Ban's 100-foot radius from the door of the White Plains Planned Parenthood encompasses the entire public sidewalk and the street on both sides of the driveway leading into the parking lot. App.11 ¶51. Debra thus cannot effectively sidewalk counsel outside the 100-foot radius. App.11 ¶51.

Debra's only options, then, are to raise or amplify her voice at women from eight feet away or to request explicit consent to approach to discuss abortion and to pass literature. App.11 ¶52. But neither lets Debra effectively carry out her intended ministry.

10

It is critical to Debra's intended ministry that she approach women within eight feet and within arm's reach to initiate conversations and to distribute pamphlets. App.8 ¶38; App.11-12 ¶53. The sensitivity of the discussion and the need for careful attention and eye contact require this close approach. App.8 ¶38; App.11-12 ¶53. To effectively sidewalk counsel, Debra must pay close attention to the woman's every word and body language, ask personal open-ended questions, and observe and listen for contradictions or ambivalence to understand the woman's situation and concerns more deeply. App.8 ¶38; App.11-12 ¶53. The close approach is even more necessary given the noisy setting, as the White Plains Planned Parenthood is located off a four-lane highway near an exit ramp from the interstate (I-287). App.8 ¶38.

Debra cannot begin her intended sidewalk counseling by requesting permission to approach. App.8 ¶39; App.12 ¶54. Such a request would not only cut into her brief and valuable window to communicate but also undermine her message, as Debra believes pregnant women are more likely to respond positively when the first words they hear are a loving message of sympathy and support. App.8 ¶39; App.12 ¶54. And such a request can easily be ignored, especially when voiced from eight feet away or when a woman is arriving at the clinic by car. App.8 ¶39; App.12 ¶54.

**B. Proceedings below**

Because the Sidewalk Counseling Ban prohibits her intended activity, *see* App.15 ¶¶64-65, Debra filed this suit on November 1, 2022.[3] She asserted one cause of action: the Sidewalk Counseling Ban is an unconstitutional content-based restriction on speech that cannot survive strict, or even intermediate, scrutiny. App.18-22 ¶¶79-97. The complaint acknowledged that the Supreme Court upheld a materially identical law banning sidewalk counseling in *Hill v. Colorado*, but argued that *Hill* was wrongly decided, is irreconcilable with intervening Supreme Court precedent, and should be overruled by the Supreme Court. App.2-3 ¶¶6-7; App.22 ¶98.

The County filed a pre-motion letter requesting a conference in connection with its anticipated motion to dismiss. App.29. The County argued for dismissal on the sole ground that "*Hill* is directly on point and binding here, and remains controlling precedent." App.30. It did not contest Plaintiff's standing to challenge the Sidewalk Counseling Ban or otherwise dispute jurisdiction. *See* App.29-31.

In response, Plaintiff reiterated her position that *Hill* was wrongly decided and should be overruled by the Supreme Court but acknowledged

---

[3]  Debra sued the County of Westchester, County Executive George Latimer, and County Attorney John M. Nonna. App.3-4 ¶¶12-14. After the County stipulated that, *inter alia*, Latimer and Nonna would be "bound by and subject to any injunction or declaratory judgment Plaintiff obtains against the County in this action," the parties agreed to drop them from the case. App.24-28.

that "*Hill* remains binding on [the district court] and forecloses her claims." App.32, 35. Because she would have to seek any relief before the Supreme Court, she noted the district court could "dispense with formal briefing, treat [the County's] pre-motion letter as the motion, and dispose of it," as contemplated by the court's individual practice rules. App.35.

The district court proceeded to do so, issuing a dispositive opinion and order without further briefing on January 3, 2023. App.36. But the district court did not limit itself to acknowledging that *Hill* controls. Instead, although the County had never disputed standing, and despite receiving no briefing or argument on the subject, the district court *sua sponte* held that Plaintiff "fail[ed] to establish Article III standing" to challenge the Sidewalk Counseling Ban. App.40.

The court reasoned that Plaintiff "has never engaged in sidewalk counseling" and "does not allege any concrete plans to do so at any point in the future." App.40. The court characterized Plaintiff's "concerns" as "nothing more than abstract, subjective fears that her rights are chilled." App.40 (cleaned up). In support of this claim, the court stated, "Plaintiff mentions that she would need 'proper training' before she would even consider sidewalk counseling." App.40. But the court overlooked the complaint's explicit allegations that Plaintiff is "[n]ow properly trained" and "prepared to engage in sidewalk counseling." App.6-7 ¶¶29-35.

The district court also addressed the merits, holding that *Hill* "forecloses Plaintiff's claims as a matter of law and provides a separate and

independent basis for the dismissal of the Complaint." App.42. Because the Sidewalk Counseling Ban is "[j]ust like the law upheld in *Hill*," the court held that Plaintiff's action is "foreclosed by directly relevant Supreme Court precedent." App.41-42.

## SUMMARY OF THE ARGUMENT

The district court dismissed the complaint on two grounds: (1) standing; and (2) the merits. The district court's standing holding is incorrect and should be reversed. On the merits, the district court correctly recognized that the Supreme Court in *Hill* upheld a law materially identical to the Sidewalk Counseling Ban. But *Hill* was wrongly decided, is irreconcilable with intervening precedent, and should be overruled by the Supreme Court.

**I.** Plaintiff has standing to bring this lawsuit. Where, as here, a plaintiff challenges a law as unconstitutional before the law is enforced against her, courts apply a three-prong test to assess whether she has established a cognizable injury in fact. The plaintiff must allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that her intended conduct is "proscribed by" the challenged law; and (3) that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-64 (2014).

Applying this test here, all three elements are easily met. Plaintiff's intended conduct—approaching women on their way into an abortion

clinic and attempting to educate and counsel them about alternatives to abortion—is core First Amendment activity and thus affected with a constitutional interest. That conduct is not arguably but *actually* proscribed under the plain terms of the Sidewalk Counseling Ban, as the County and district court acknowledged below. And because the County just enacted the Sidewalk Counseling Ban in 2022, has never disavowed an intent to enforce it, and has vigorously defended its legality in this litigation, Plaintiff's "fear that the law will be enforced against" her is "actual and well-founded." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). Having never questioned it below, the County cannot seriously argue that Plaintiff lacks standing.

The district court's standing holding is wrong on both the law and the facts. On the law, the district court faulted Plaintiff for failing to identify a specific "point in the future" at which she had "concrete plans" to sidewalk counsel. But no case requires a plaintiff in the pre-enforcement context to give a specific date and time when she will engage in proscribed conduct, and the district court cited none. The question is simply whether the plaintiff has "an intention to engage in" the proscribed "course of conduct." *Susan B. Anthony List*, 573 U.S. at 159. Plaintiff here plainly does.

On the facts, the district court repeatedly characterized Plaintiff as having alleged that "she would need 'proper training' before she would even consider sidewalk counseling." App.40. But Plaintiff alleged no such

thing. She alleged that she initially "*needed*" training but has since *obtained* it—such that she is "[n]ow" "prepared to engage in sidewalk counseling." App.6-7 ¶¶29-35 (emphasis added). The district court's demonstrable misreading of the complaint vividly illustrates the error of its ruling.

Like injury in fact, the other standing elements—causation and redressability—were undisputed below and are indisputable here. Plaintiff's intended speech has been inhibited by the Sidewalk Counseling Ban and would be uninhibited if her First Amendment claims succeed. Plaintiff has standing to challenge the Sidewalk Counseling Ban.

**II.**     On the merits, the district court was correct that this case is controlled by *Hill*. But while *Hill* remains binding for now, it should not for long. *Hill* "distorted First Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276 & n.65. And even if *Hill* means Plaintiff "must seek relief in the High Court," rather than here, this Court should not hesitate to recognize the "incongruity between *Hill* and the [Supreme] Court's current jurisprudence," *Price v. City of Chicago*, 915 F.3d 1107, 1118-19 (7th Cir. 2019)—particularly given the dire urgency of the speech that *Hill* permits governments like the County to suppress, *see, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 920 (2000) ("Millions of Americans believe that … an abortion is akin to causing the death of an innocent child.").

Absent *Hill*, the First Amendment analysis here would be straightforward. Laws that restrict speech based on "its communicative content"

trigger strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Sidewalk Counseling Ban is content based on its face. The ban on "approach[es]" depends on what the person approaching intends to say. *See* Laws of Westchester County § 425.31(*i*). If she approaches to "pass[] any material," display a sign, or "engag[e] in oral protest, education, or counseling," *id.*, she has committed an offense. If she approaches to engage in speech for any other purpose—for example, to ask for the time, for directions, or for bus fare—she has not.

The Sidewalk Counseling Ban therefore must face strict scrutiny—the most rigorous level of constitutional review. But the Ban cannot survive even intermediate scrutiny, making the answer on strict scrutiny follow *a fortiori*.

If the County wishes to promote access to abortion and to combat violence outside clinics, it has many options for doing so. These options may be pursued without criminalizing the paradigmatic First Amendment activity at issue here—walking up to someone on a public way, talking about a topic of public concern, and offering a pamphlet. Indeed, given the numerous other restrictions the County enacted in the *same law* of which the Sidewalk Counseling Ban is a part, the only *additional* function served by the Sidewalk Counseling Ban is prohibiting peaceful, non-obstructive speech aimed simply at persuading and informing.

That may be exactly the County's true purpose. But while violence and obstruction of course may be forbidden, sidewalk counselors have a fundamental right to attempt to peacefully "persuade" a fellow citizen "to change her mind and heart." *Hill*, 530 U.S. at 757 (Scalia, *J.*, dissenting). The Sidewalk Counseling Ban violates the First Amendment.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a complaint for lack of standing pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017). The Court "accept[s] the allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022).

To withstand a Rule 12(b)(1) motion to dismiss for lack of standing, the complaint must "allege[] facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (cleaned up). Likewise, to survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298-99 (2d Cir. 2022).

## ARGUMENT

## I. Plaintiff has standing to challenge the Sidewalk Counseling Ban.

Plaintiff seeks to engage in sidewalk counseling, but the Sidewalk Counseling Ban prohibits that practice, threatening her with criminal and civil penalties (jail time included) if she does so. Under settled precedent, that gives her standing to challenge the Ban's constitutionality. The district court's contrary conclusion was erroneous.

"The requisite elements of Article III standing are well established: A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022). All three requirements are easily met here.

### A. Plaintiff has established pre-enforcement injury in fact.

The only standing requirement the district court disputed was injury in fact. App.39. But, having raised standing *sua sponte* and lacking the benefit of briefing or argument, the district court failed to apply the governing injury-in-fact test for pre-enforcement constitutional challenges like this one. This case shows why "it is bad practice for a district court to dismiss" on a ground on which the plaintiff has lacked "an opportunity to be heard." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53-54 (2d Cir. 2022).

19

In pre-enforcement cases, a "plaintiff need not first 'expose himself to liability before bringing suit.'" *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022). Rather, the Supreme Court has established a three-part test for injury in fact in such cases. Under this test, the plaintiff must allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest" (2) that the "intended future conduct is 'arguably proscribed by [the] statute'" the plaintiff "wish[es] to challenge"; and (3) that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159, 162.

This test "sets a low threshold and is quite forgiving." *Picard*, 42 F.4th at 98. And the Supreme Court and this Court have repeatedly found it met where it is "reasonable enough" for the plaintiff to fear that engaging in her intended speech will lead to liability under the challenged statute. *Id.* at 98-99; *see also, e.g.*, *Susan B. Anthony List*, 573 U.S. at 163.

The reason is simple: "most people are frightened of violating criminal statutes." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). So "self-censorship" is "a harm that can be realized even without an actual prosecution." *Vt. Right to Life*, 221 F.3d at 382. Moreover, without this "somewhat relaxed" standing test, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017), plaintiffs would be required either to "refrain[] from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law"—an "unattractive set of options" not required by Article

20

III, *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

Here, all three elements of injury in fact for a pre-enforcement challenge are satisfied—as the County never disputed below.

*First*, Plaintiff's intended conduct is arguably affected with a constitutional interest. The complaint alleges that Plaintiff seeks to engage in sidewalk counseling—that is, to "peacefully approach women entering abortion clinics," "speak with them about alternatives to abortion," and "offer … a pamphlet." App.4 ¶15; App.9 ¶42; *see also* App.6 ¶28; App.7-9 ¶¶35-42. Such "speech" is "certainly 'affected with a constitutional interest.'" *Susan B. Anthony List*, 573 U.S. at 162. Traditional public fora like sidewalks and public ways "are areas that have historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). And "[l]eafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment." *Id.* at 488-89; *see also, e.g.*, *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362-63 (2d Cir. 1989) (protecting speech outside abortion clinics).

*Second*, Plaintiff's sidewalk counseling is proscribed by the challenged law. This element merely requires that "the plaintiff's intended conduct" be "'*arguably* proscribed' by the challenged statute"; it need not be "*in fact* proscribed." *Picard*, 42 F.4th at 98. Here, however, Plaintiff's intended sidewalk counseling is not arguably but "*clearly* prohibited by"

21

the Sidewalk Counseling Ban. *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (emphasis added). Indeed, both the district court and the County acknowledged as much below. *See* App.37 (district court: sidewalk counseling is "a practice that violates" the Ban); App.30 (County: Plaintiff can counsel and offer pamphlets "as long as [these activities] are not done while approaching within eight feet" without consent).

The Sidewalk Counseling Ban makes it illegal, (1) within 100 feet of an abortion clinic, (2) to "knowingly approach" within eight feet of another person (3) absent the other person's consent (4) "for the purpose of passing any material … or engaging in oral protest, education, or counseling." Laws of Westchester County § 425.31(*i*). That is exactly what the complaint alleges Plaintiff seeks to do:

(1) stand "within the 100-foot radius" of the White Plains Planned Parenthood, since that radius encompasses "the entire public sidewalk" in front of the building and reaches well into the street on either side of the clinic's driveway, App.11 ¶51;

(2) "approach within eight feet and within arm's reach" of women entering the clinic, since she seeks to use a gentle tone of voice, initiate an intimate conversation, pass pamphlets, and be heard over the nearby noisy roadway, App.8 ¶38; App.11 ¶53;

(3) not "begin by seeking permission," since "[s]uch a request would cut into her valuable window to communicate, would be easily ignored, and would undermine her message," App.8 ¶39; App.12 ¶54; and

(4) "educate women on abortion, inform them of alternatives, and advise them of services and resources available to them

22

if they carry their babies to term," including by offering "a pamphlet or other literature," App.6 ¶28; App.12 ¶53; *see also* App.7 ¶31; App.7-8 ¶36; App.8 ¶38; App.9 ¶¶41-42.

This conduct is unambiguously proscribed by the plain terms of the Sidewalk Counseling Ban.

*Finally*, Plaintiff faces a credible threat of enforcement. This element generally follows from the first two "as long as the relevant statute is recent and not moribund." *Cayuga Nation*, 824 F.3d at 331. That is, "[w]here a statute specifically proscribes conduct, the law of standing does 'not place the burden on the plaintiff to show an intent by the government to enforce the law against it.'" *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019). Rather, courts "generally … presume that the government will enforce the law," *Cayuga Nation*, 824 F.3d at 331, absent "a disavowal by the government or another reason to conclude that no such intent existed," *Tong*, 930 F.3d at 71.

Here, the Sidewalk Counseling Ban is plainly "recent and not moribund," *Cayuga Nation*, 824 F.3d at 331, as it was enacted just months before Plaintiff filed this suit. And while the presumption of enforcement may be rebutted if the defendant "disavow[s] … an intent[] to prosecute," *id.* at 331-32, the County has done nothing of the sort here, *see Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").

23

Far from it—the County has vigorously defended the Sidewalk Counseling Ban's legality, never hinting that it would not enforce the Ban. *See* App.29-30. And committee meetings leading to the Act's passage included discussions about enforcement logistics, like the training of police. *See* Joint Meeting of the Westchester County Legislature Committees on Health and Legislation, at 14:47-16:04, 1:18:58-1:19:25, 1:48:00-1:48:50 (June 1, 2022), https://tinyurl.com/dxjv55hw; *see also Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022) ("courts may take judicial notice of legislative history" in ruling on motion to dismiss). In short, the County has come nowhere close to assuring those who wish to engage in sidewalk counseling "that [they] will not be prosecuted if they do what they say they wish to do." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010). Rather, it has suggested the opposite.

Further, the credible-threat showing is "bolstered" by the fact that authority to enforce the Sidewalk Counseling Ban is not limited to County officials but extends to "private complainant[s]." *Susan B. Anthony List*, 573 U.S. at 164-65. In addition to criminal prosecution and civil enforcement actions by the County Attorney, the Act exposes Plaintiff to private civil actions by "any person whose ability to access the premise of [an abortion clinic] has been interfered with" or any abortion-clinic "owner," "operator," "employee," "volunteer," and "invitee." Laws of Westchester County § 425.51. This only underscores the "real risk" of enforcement

Plaintiff faces if she sidewalk counsels notwithstanding the Ban. *Susan B. Anthony List*, 573 U.S. at 164.

In short, Plaintiff "is not required either to pursue 'arguably illegal activity,' or to expose [her]self to criminal liability before bringing suit to challenge 'the constitutionality of [a] law threatened to be enforced.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 385 (2d Cir. 2015). Under the test applicable "in the context of pre-enforcement challenges," *id.* at 384, she has established injury in fact.

**B. The district court's injury-in-fact conclusion was erroneous.**

The district court failed to apply this long-established three-part test for assessing injury in fact in the pre-enforcement context. *See* App.39-40. And the district court's reasons for finding lack of standing badly miss the mark.

The district court said Plaintiff lacked standing because she "only alleged, 'in the most general fashion,' that her exercise of free speech has been chilled by" the Sidewalk Counseling Ban, without "alleg[ing] any concrete plans to" sidewalk counsel "at any point in the future." App.40. Attempting to buttress this argument, the district court stated that "Plaintiff mentions that she would need 'proper training' before she would even consider sidewalk counseling." App.40. (quoting Compl. ¶29).

But a plaintiff asserting a pre-enforcement claim need only allege "an intention to engage in a course of conduct." *Picard*, 42 F.4th at 101. She need not specify the exact date and time *when* she will engage in that

25

conduct. And in any event, it is hard to see how the complaint could be more "concrete" about Plaintiff's intended speech.

The complaint alleges exactly where Plaintiff seeks to sidewalk counsel—at the White Plains Planned Parenthood. App.7 ¶35. It alleges the genesis of Plaintiff's desire to sidewalk counsel—her participation in prayer vigils and observation of others sidewalk counseling at the clinic. App.5-6 ¶¶24-28. It details exactly how Plaintiff intends to sidewalk counsel—by "ask[ing] open-ended questions"; "shar[ing] … other options" the woman "might wish to consider"; "tell[ing] the woman that she is made in the image and likeness of God"; "empower[ing her] to choose life"; drawing on her training, "personal experiences as a mother" and "occupational therapist," and her work as a life consultant at a crisis pregnancy center; and offering "a pamphlet or other literature." App.7-12 ¶¶36-55. It even lists *specific language* Plaintiff intends to use to initiate her sidewalk-counseling conversations—"You are not alone. We can help you." App.8 ¶37.[4]

---

[4] *See also, e.g.*, App.7-8 ¶36 ("She would ask about the woman's needs, strengths, and areas of awareness (feelings, thoughts, wants, values, and beliefs), as well as the attitudes, feelings, and responses of the woman's parents and the unborn child's father."); App.8 ¶37 ("She would inform the woman that there are people who will be there to love and care for her and her child should she carry the child to term … ."); App.8 ¶38 (she would "pay close attention to the woman's every word and body language, ask open-ended questions, interpret what she believes she is hearing, and observe and listen for contradictions and ambivalence to understand more deeply").

To be sure, the complaint does not identify a date and time at which Plaintiff will engage in sidewalk counseling if the Sidewalk Counseling Ban is enjoined or declared unconstitutional. That is hardly surprising given that Plaintiff could not possibly know in advance *when* the courts will invalidate the Ban. In any event, "First Amendment plaintiffs generally need not state that they 'have specific plans to engage in XYZ speech next Tuesday' in order to show standing." *Peck v. McCann*, 43 F.4th 1116, 1131 (10th Cir. 2022). They simply must state a "present desire" to engage in the proscribed speech, *id.* at 1130-32—as Plaintiff here has, *see* App.15 ¶64 ("earnest desire to engage in sidewalk counseling outside the White Plains Planned Parenthood").

That this intention is sufficiently "imminent," *Centro*, 868 F.3d at 111, is unmistakable. The complaint alleges that Plaintiff is "[n]ow … prepared to engage in sidewalk counseling." App.7 ¶35. It says she "intends," "seeks to," and "would" do so "[b]ut for the Sidewalk Counseling Ban." App.1 ¶2; App.11 ¶53; App.15 ¶¶64-66. And it alleges that she has not done so "because of the Sidewalk Counseling Ban," App.15 ¶64—such that her speech has already been "chill[ed]," App.15 ¶66.

These are precisely the kind of allegations that have repeatedly been held sufficient to establish pre-enforcement standing. In *Davis v. FEC*, for example, the Supreme Court held that a plaintiff established standing to challenge campaign disclosure requirements "by simply declaring his intention to run for office and to spend more than the amount for which

27

disclosure was required." *Centro*, 868 F.3d at 111 (discussing *Davis*, 554 U.S. 724, 733-35 (2009)). In *Humanitarian Law Project*, the Court found standing where the plaintiffs "claim[ed]" they "would provide" support to foreign organizations "if the statute's allegedly unconstitutional bar [on that conduct] were lifted." 561 U.S. at 15-16. And in *Cayuga Nation*, this Court found standing where the plaintiffs "alleged that they intend to conduct bingo games, which is clearly prohibited by the Ordinance." 824 F.3d at 331. Further examples abound.[5]

---

[5] *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (finding standing to challenge law arguably proscribing boycotting campaigns where plaintiffs "have alleged in their complaint an intention to continue to engage in boycott activities in that State"); *Steffel v. Thompson*, 415 U.S. 452, 456 (1974) (finding standing where "Petitioner alleged in his complaint that, although he desired to return to the shopping center to distribute handbills, he had not done so because of his concern that he, too, would be arrested for violation" of the statute challenged in the case); *Picard*, 42 F.4th at 95, 97-101 (finding standing where plaintiff "state[d]" that "[a]bsent his fear of" the challenged law, "he would continue to promote jury nullification outside New York courthouses"); *see also, e.g.*, *Peck*, 43 F.4th at 1131 (declining "to require categorically that … First Amendment plaintiffs know exactly what they would say and when they want to say it in order to challenge a speech-restrictive law"); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020) (finding pre-enforcement standing where student plaintiffs alleged that they "want[ed] to engage in … debate" and "want[ed] to speak" about specific issues but were "'afraid to voice their views out of fear that their speech' may violate University policies"); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018) (finding pre-enforcement standing where business-owner plaintiffs "ma[de] clear that if it were legal to do so, [they] would charge more for credit card purchases," describing "when, to whom, where, and under what circumstances they would do

None of these cases required the plaintiffs to say exactly *when* (date or time) they would engage in proscribed conduct; they simply had to say that they intended to or would do so but for the challenged law—as Plaintiff here has. And a specific-time-or-date requirement is especially unwarranted in the procedural posture of this case, since "at the pleading stage," even "general factual allegations of injury resulting from the defendant's conduct may suffice." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

The district court nonetheless characterized Plaintiff's injury as too "abstract," latching onto the notion that Plaintiff still "would need 'proper training' before she would even consider sidewalk counseling." App.40 (quoting Compl. ¶29). This idea was an apparent linchpin of the court's reasoning, appearing twice in its eight-page opinion. App.38, 40. And the court even (mistakenly) raised it in a related case, stating, "I don't recall which plaintiff it was," but "somebody—one of the plaintiffs indicat[ed] that they needed more training or some such." Transcript at 11:2-8, *Hulinsky v. County of Westchester*, No. 7:22-cv-6950 (S.D.N.Y. Jan. 18, 2023) (Halpern, *J.*), ECF No. 67-1.

The problem is that the district court's premise is a demonstrable misreading of the complaint. The complaint does not say Plaintiff "*would*

---

so: … at their stores, on their customers, when credit card surcharges are legal" (cleaned up)).

*need* 'proper training'" to begin counseling. App.40 (emphasis added). It says—past tense—that she "*needed* proper training," App.6 ¶29 (emphasis added), which she then obtained. Indeed, the next five paragraphs of the complaint after the one the district court cited specify how Plaintiff "registered for and completed multiple online" training classes and gained experience working as a life consultant at a crisis pregnancy center. App.7 ¶¶30-34. The complaint then alleges—this time in the present tense—"*Now properly trained* and with experience as a life consultant, Debra *is prepared* to engage in sidewalk counseling." App.7 ¶35 (emphasis added). It further alleges that she would do so "[b]ut for the Sidewalk Counseling Ban." App.15 ¶65; *see also* App.9 ¶43; App.15 ¶¶64, 66.

So the district court's understanding of the "training" allegations was simply mistaken. In fact, that Plaintiff has taken these tangible steps to learn how to engage in effective sidewalk counseling, has obtained pamphlets to distribute while sidewalk counseling, and has provided specific examples of the language she intends to use while sidewalk counseling only confirms the plausibility of her intent to sidewalk counsel. *See, e.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1172 (10th Cir. 2021) (finding standing because "[a]lthough Appellants have not yet offered wedding website services, Ms. Smith has been employed as a graphic and web designer in the past," and "Appellants … provided clear examples of the types of websites they intend to provide"), *cert. granted in part*, 142 S. Ct. 1106, *argued* (Dec. 5, 2022).

30

Neither of the cases cited by the district court supports its result. The district court primarily relied on this Court's decision in *Walsh*. App.40 (citing 714 F.3d at 688-90). But *Walsh found* standing for a pre-enforcement First Amendment challenge and thus only supports Plaintiff here. *See* 714 F.3d at 688-90. In *Walsh*, an advocacy organization brought a pre-enforcement challenge to a law regulating "political committee[s]," providing examples of advertisements it wanted to publish that it feared would render it subject to the law. *Id.* at 685-86. This Court found standing because, "[c]omparing th[e] proposed advertisements" submitted by the plaintiff "with the plain text of" the challenged law, the plaintiff "plausibly contend[ed]" the ads could render it a "political committee." *Id.* at 690. So too here. Comparing Plaintiff's intended speech with the plain text of the Sidewalk Counseling Ban, Plaintiff's intended conduct is not just "plausibly" but *obviously* proscribed. *See supra* pp.21-23. Her injury is therefore just as "real and imminent" (if not more) as the *Walsh* plaintiff's. 714 F.3d at 689.

The court also relied on a pre-*Susan B. Anthony List* district-court decision, *Kounitz v. Slaaten*, 901 F. Supp. 650 (S.D.N.Y. 1995). App.40. But *Kounitz* is not just non-binding but also entirely irrelevant, as the case did not involve a pre-enforcement constitutional challenge to legislation at all. *See* 901 F. Supp. at 654-55.

Finally, the district court said, "Plaintiff admits … she has never engaged in sidewalk counseling," suggesting this was inconsistent with

31

standing. App.40. But even setting aside Plaintiff's extensive experience with similar pro-life activities—like sidewalk vigils and life consulting, *see supra* pp.5, 7—what matters is whether she "intends to" engage in sidewalk counseling "in the future," not whether she has done it in the past. Thus, in *303 Creative*, the Tenth Circuit found that plaintiffs who had never before "offered wedding website services" had standing to challenge a requirement that wedding-website designers design for same-sex weddings. 6 F.4th at 1171-72. And in *Telescope Media Group v. Lucero*, the Eighth Circuit found that plaintiffs who had not yet "enter[ed] the wedding-video business" had standing to challenge a requirement that wedding videographers film for same-sex weddings. 936 F.3d 740, 749-50 (8th Cir. 2019). The district court failed to cite a single case holding otherwise.

Plaintiff has adequately alleged injury in fact. The district court's contrary holding was incorrect.

**C. Plaintiff has established causation and redressability.**

With injury in fact established, the remaining standing elements—causation and redressability—are straightforward. *See Cruz*, 142 S. Ct. at 1646. Neither the district court nor the County disputed them.

First, Plaintiff's injury—her inability to engage in sidewalk counseling at the White Plains abortion clinic—is obviously "fairly traceable to the challenged conduct of the defendant." *Id.* If there were no Sidewalk Coun-

seling Ban, Plaintiff could freely engage in her intended sidewalk-counseling ministry without fear of penalties or prison. As the Supreme Court has "made clear," "an injury resulting from the application or threatened application of an unlawful enactment [is] fairly traceable to such application." *Id.* at 1647. That principle controls here.

Second, Plaintiff's injury is "likely to be redressed by the requested relief." *Id.* at 1646. If the Court grants the relief sought in Plaintiff's complaint—such as an order enjoining application of the Sidewalk Counseling Ban or a declaration that it is unconstitutional, App.22—then the Sidewalk Counseling Ban will no longer inhibit her speech. *See Cayuga Nation*, 824 F.3d at 332 (favorable decision "may redress the injury alleged in the complaint by preventing the Village from enforcing the Ordinance against the plaintiffs, which is all that is required to establish Article III standing"). And Plaintiff further seeks nominal and compensatory damages, App.22, which would "independently provide redress," *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

\* \* \*

Plaintiff has standing to challenge the Sidewalk Counseling Ban. The district court's contrary holding should be reversed.

## II. The Sidewalk Counseling Ban violates the First Amendment.

On the merits, the district court was right that this case is (for now) controlled by *Hill*. But *Hill* is wrong, irreconcilable with intervening precedent, and ripe for overruling by the Supreme Court—and this Court

should not hesitate to say so. *See Price*, 915 F.3d at 1110-19. Under the correct First Amendment analysis, the Sidewalk Counseling Ban is unconstitutional.

### A. *Hill* applies here.

The district court was right that it was bound by *Hill* to reject Plaintiff's claims. At issue in *Hill* was a Colorado law that made it unlawful, within 100 feet of an abortion-clinic entrance, to "knowingly approach" within eight feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling," without that person's consent. 530 U.S. at 707 n.1 (quoting Colo. Rev. Stat. § 18-9-122(3)). As here, the law was challenged by sidewalk counselors who claimed it violated the First Amendment. *Id.* at 708-09. Yet the Supreme Court upheld the law, determining it was "content neutral" and satisfied intermediate scrutiny. *Id.* at 719-30.

The County's Sidewalk Counseling Ban was modeled after the law approved in *Hill*. *See* Board of Legislators Meeting Agenda at 26 (June 27, 2022), https://perma.cc/E26U-W3GQ. And although the Sidewalk Counseling Ban is in some ways more targeted and restrictive—for example, the *Hill* law applied to *all* "health care facilities," while the Sidewalk Counseling Ban applies only to "*reproductive* health care facilit[ies]," § 425.31(*i*) (emphasis added)—these differences are immaterial under *Hill*'s blunt-instrument reasoning. *See Hill*, 530 U.S. at 724-25 (even if a law "was obviously enacted in response to the activities of antiabortion

protestors," it can remain "content neutral"); *see also Agostini v. Felton*, 521 U.S. 203, 237-38 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (cleaned up)). Thus, *Hill* "remains binding" for now and supports the district court's dismissal. *Price*, 915 F.3d at 1109.

## B. *Hill* was wrongly decided, is irreconcilable with intervening precedent, and should be overruled by the Supreme Court.

But that does not mean *Hill* was right. Far from it. As a majority of the Supreme Court last year recognized, *Hill* "distorted First Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276 & n.65. Worse, it did so in a context involving extraordinarily high stakes, silencing speech that (in the view of sidewalk counselors and many other Americans) could make the difference between a woman choosing to preserve or to end another human life. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("Urgent, important, and effective speech" receives the "greate[st] constitutional protection"); *see also, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 882 (1992) (plurality opinion) ("ensur[ing] that a woman apprehend the full consequences of her decision … furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences,

that her decision was not fully informed"), *overruled on other grounds by Dobbs*, 142 S. Ct. 2228. *Hill* must be reconsidered.

### 1. *Hill* was wrongly decided.

*Hill* flouted established First Amendment doctrine the day it was decided. Start with content neutrality. Under the First Amendment, laws that are "content based"—that is, laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content"—are subject to "the most exacting scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). These laws "are presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), surviving only if they "promote a compelling interest" and use "the least restrictive means to further the articulated interest," *Sable Commc'ns. of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). Content-neutral laws, meanwhile, "are subject to an intermediate level of scrutiny." *Turner*, 512 U.S. at 642. Even these laws must be "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The *Hill* law was content based on its face. As with the Sidewalk Counseling Ban, the law's ban on unconsented approaches by its terms applied only if the intended speech contained certain content—"protest, education, or counseling." In other words, "[w]hether a speaker must obtain permission before approaching within eight feet" turned "entirely on *what he intends to say* when he gets there." *Hill*, 530 U.S. at 742 (Scalia, *J.*, dissenting). Such a rule is "undeniably content based." *Id.*

36

Yet the *Hill* Court elided the question whether the law was content based on its face. Instead, the Court looked to the government's *purpose* in enacting the law, holding that the content-neutrality inquiry depended on whether the "government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 719 (majority opinion) (cleaned up). Applying this test, the Court held the law was content neutral, since the Colorado legislature's motive was not to suppress pro-life speech but to "protect listeners from unwanted communication." *Id.* at 714-20.

Even taking this test as the right one, the Court's conclusion was debatable. *See id.* at 767 (Kennedy, *J.*, dissenting) ("We would close our eyes to reality were we to deny that 'oral protest, education, or counseling' outside the entrances to medical facilities concern a narrow range of topics—indeed, one topic in particular."). More to the point, the Court had never held that a legislature's having a content-neutral motive could rescue a facially content-based law from heightened scrutiny. Rather, it had held the opposite—that "the mere assertion of a content-neutral purpose" is not "enough to save a law which, on its face, discriminates based on content." *Turner*, 512 U.S. at 642-43. In other words, contrary to *Hill*, "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991).

Equally unmoored from precedent was the *Hill* Court's application of intermediate scrutiny. Having deemed the law content neutral, the Court proceeded to ask whether it served a "significant and legitimate" governmental interest and was "narrowly tailored" to that end. 530 U.S. at 725. The Court answered yes to both questions. The law served the allegedly legitimate and important interest in "protect[ing] listeners from unwanted communication." *Id.* at 715-18. And although the law was concededly "prophylactic"—forbidding even approaches that ultimately "would have proved harmless"—that cut in its *favor*, since its "brightline … rule" offered "clear guidance" for enforcement. *Id.* at 729-31.

Yet both these holdings departed from settled principles. Never had the Court recognized the claimed interest—a "right to be free from unwanted speech when on the public streets and sidewalks"—to be significant or even legitimate. *Id.* at 752 (Scalia, *J.*, dissenting). To the contrary, the Court had previously held that when faced with the prospect of unwanted speech in a public forum, "the burden normally falls" on the listener to plug his ears or "avert [his] eyes." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210-11 (1975). This principle, the Court had said, was necessary "to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (cleaned up). Three years before *Hill*, the Court had even applied this reasoning *specifically* in the context of speech outside abortion clinics,

38

rejecting any alleged "right of the people approaching and entering [abortion] facilities to be left alone." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997).

Moreover, the notion that it is a feature, and not a bug, for a speech regulation to be "prophylactic" was likewise an innovation. *Cf. Hill*, 530 U.S. at 729. Rather, the Court had long explained that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963). "Prophylaxis" may be acceptable outside the First Amendment context, but it is, as a matter of language and logic, "the antithesis" of the "narrow tailoring" required for laws infringing speech. *Hill*, 530 U.S. at 762 (Scalia, *J.*, dissenting).

*Hill*'s errors were widely recognized, leading it to be "condemned by progressive and conservative legal scholars alike." Alan K. Chen, *Statutory Speech Bubbles, First Amendment Overbreadth, and Improper Legislative Purpose*, 38 Harv. C.R.-C.L. L. Rev. 31, 31 (2003). Professor Michael McConnell remarked that while the Supreme Court in *Hill* "said that this statute is content-neutral[,] I just literally cannot see how they could possibly come to that conclusion." Colloquium, *Professor Michael W. McConnell's Response*, 28 Pepp. L. Rev. 747, 748 (2001). Professor Laurence Tribe agreed, stating, "I don't think [*Hill*] was a difficult case. I think it was slam-dunk simple and slam-dunk wrong." *Id*. at 750. And

Professor Richard Fallon explained that in *Hill*, the Court "unconvincingly … maintain[ed] that a content-based restriction on speech is not really content-based." Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1298 (2007).

### 2. *Hill* is irreconcilable with intervening precedent.

In the two decades since *Hill* was decided, the Supreme Court's "intervening decisions have eroded *Hill*'s foundation." *Price*, 915 F.3d at 1111. Specifically, in two recent watershed First Amendment decisions—*McCullen v. Coakley* and *Reed v. Town of Gilbert*—the Supreme Court rejected each of the core premises underlying *Hill*.

First, in *McCullen*, the Supreme Court held that a Massachusetts law forbidding speakers from standing within thirty-five feet of abortion-clinic entrances violated the First Amendment. The Court held that this law (like the *Hill* law) was content neutral because the law's prohibition was triggered merely by a person's proximity to an abortion clinic, not by the content of her speech. 573 U.S. at 479-80. But in explicating the meaning of content neutrality, the Court opined that the law "*would be* content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* at 479 (emphasis added). This is the precise test the *Hill* Court *refused* to adopt, claiming that "we have never suggested" that a need for an "examination" of content would make a law content based. 530 U.S. at 721-22.

40

Similarly, the *McCullen* Court held that the law at issue there "would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech." 573 U.S. at 481 (cleaned up). "If, for example," the regulated speech "caused offense or made listeners uncomfortable, such offense or discomfort would not give the [government] a content-neutral justification to restrict the speech." *Id.*

This holding is irreconcilable with finding the *Hill* law content neutral, even under *Hill*'s own analysis. Again, *Hill* identified the government interest allegedly justifying Colorado's law as protecting abortion-clinic patients from the "potential trauma … associated with confrontational protests." 530 U.S. at 715. That interest is indisputably one "concerned with [the] impact of speech on its audience." *McCullen*, 573 U.S. at 481. Indeed it is indistinguishable from the specific example offered as content based in *McCullen*. *Cf. Hill*, 530 U.S. at 734 ("This statute simply empowers private citizens entering a health care facility with the ability to prevent a speaker … from communicating a message they do not wish to hear.").

Turning to intermediate scrutiny, here too *McCullen* undermined *Hill*. In *Hill*, the Court held that the law's "bright-line prophylactic rule" was justified based on the "great difficulty" in protecting abortion clinics and patients through more tailored "legal rules that focus exclusively on the individual impact of each instance of behavior." *Id*. at 729. Echoing *Hill*,

the government in *McCullen* defended its law as a prophylactic measure that would be an easily enforceable bright-line rule—even if it restricted more speech than necessary to advance the government's interests. 573 U.S. at 495-96.

Yet the *McCullen* Court rejected this argument in language flatly irreconcilable with *Hill*. Although "[a] painted line on the sidewalk is easy to enforce," the Court explained, "the prime objective of the First Amendment is not efficiency." *Id.* at 495. Rather, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier," *id.*—a showing Massachusetts there had failed to make. *See also id.* at 486 ("[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." (cleaned up)).

The year after *McCullen*, the Supreme Court decided *Reed*, which held that a city "sign code" violated the First Amendment. Citing *Hill*, the lower courts found the sign code content neutral on the ground that the city "'did not adopt its regulation of speech because it disagreed with the message conveyed' and its 'interests [were] unrelated to … content.'" 576 U.S. at 162-63. But citing the *Hill* dissents, the Supreme Court rejected

42

this approach, holding that this focus on "governmental motive" "misunderstand[s]" content neutrality. *Id.* at 166-67 (citing *Hill*, 530 U.S. at 766 (Kennedy, *J.*, dissenting)).

To the contrary, *Reed* held that even if the government has a "benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," a law that is facially content based triggers strict scrutiny. *Id.* at 165. In other words, a law is content based—and strict scrutiny applies—"*either*" when it is "content based on its face" *or* when its "purpose and justification … are content based." *Id.* at 166 (emphasis added). *Reed* thus makes clear that by focusing on Colorado's allegedly content-neutral justification for its law, rather than the law's plainly content-based text, the *Hill* Court "skip[ped] the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face." *Id.* at 165.

In short, as a unanimous Seventh Circuit panel including then-Judge Barrett explained, "*Hill* is incompatible with current First Amendment doctrine as explained in *Reed* and *McCullen.*" *Price*, 915 F.3d at 1117; *see also Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 408 (6th Cir. 2022) (Sutton, *C.J.*) ("[T]here may be some tension between *Hill* (which upheld a floating bubble zone restriction) and *McCullen* (which invalidated a fixed buffer zone restriction)."); *New York v. Griepp*, 991 F.3d 81, 143 (2d Cir. 2021) (Livingston, *C.J.*, dissenting) (noting that "the Supreme Court has recognized such laws [in *Hill* and *Price*] to impose an

especially significant First Amendment burden on traditional forms of expression such as normal conversation and leafletting on a public sidewalk" (cleaned up) (quoting *McCullen*, 573 U.S. at 488-89)), *majority decision vacated on rehearing*, 11 F.4th 174. Each of *Hill*'s core pillars—its methodology for determining content neutrality, its view of what constitutes a content-neutral justification, and its understanding of narrow tailoring—were aberrations when *Hill* was decided and stand in "stark contrast" with recent Supreme Court precedent. *Price*, 915 F.3d at 1118.

### 3. *Hill* is ripe for overruling.

This Court may lack authority to resolve the tension itself. *See, e.g.*, *Price*, 915 F.3d at 1111 ("The Court's intervening decisions have eroded *Hill*'s foundation, but the case still binds us; only the Supreme Court can say otherwise."); *Turco v. City of Englewood*, 935 F.3d 155, 167 (3d Cir. 2019) ("Given the Court's analysis in *Hill*, we simply cannot conclude that the eight-foot buffer zones established under the Ordinance posed a severe burden on speech."). But there is no mystery how the tension must ultimately be resolved—by overruling *Hill*.

In *Dobbs*, a Supreme Court majority faulted "[t]he Court's abortion cases" for "distort[ing] First Amendment doctrines," citing the *Hill* dissents. 142 S. Ct. at 2275-76 & n.65. The era resulting in *Hill*—in which courts "engineer[ed] exceptions to" ordinary rules in order to "vindicat[e]" abortion over other interests—is now over. *Id.* at 2275-76; *see also, e.g.*, *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*,

44

40 F.4th 1320, 1328 (11th Cir. 2022) (Pryor, *C.J.*) ("[T]o the extent that this Court has distorted legal standards because of abortion, we can no longer engage in those abortion distortions in the light of [the *Dobbs*] decision instructing us to cease doing so.").

Likewise, in *City of Austin v. Reagan National Advertising of Austin, LLC*, Justices Thomas, Gorsuch, and Barrett viewed *Hill* as so plainly "discredited" that merely comparing the majority's approach to *Hill* constituted a criticism. 142 S. Ct. 1464, 1481, 1490 (2022) (Thomas, *J.*, dissenting). In response, the majority did not defend *Hill*. Rather, it disclaimed reliance on it, calling it a decision "we do not cite." *Id.* at 1475 (majority opinion).

Indeed, not even the County believes *Hill* remains reliable precedent. In a committee meeting leading to the Sidewalk Counseling Ban's passage, the County Attorney cited *Price* and *City of Austin*'s "dissent excoriating *Hill*," warned that "[i]f this legislation … ever got [to the Supreme Court], I have real questions," and stated that "I think we know what the Supreme Court would rule if this ever got there," "so hopefully our legislation never gets to the Supreme Court." Joint Meeting, *supra*, at 39:55-40:39, 1:53:11-1:53:17. The County Attorney also stated that "there are

45

some recent appointees by the former president on the Second Circuit that I don't think would support us here." *Id.* at 40:35-40:50.[6]

As this case demonstrates, *Hill* continues to do real damage. Debra Vitagliano is trained, ready, and willing to engage in sidewalk counseling now, in the hopes that some women, upon receiving her information and support, might choose life for their unborn children. The County's law—justified only by *Hill*—strips her of that opportunity.

## C. Under a proper First Amendment analysis, the Sidewalk Counseling Ban is unconstitutional.

Absent *Hill*, the analysis in this case would be straightforward: the Sidewalk Counseling Ban violates the First Amendment.

### 1. The Sidewalk Counseling Ban is content based.

The Sidewalk Counseling Ban is content based under *Reed* and *McCullen*. As explained, there are two ways in which a law can be content based and thus subject to strict scrutiny—if it "is content based on its face" or if "the purpose and justification for the law are content based."

---

[6] Outside legal experts who also testified at the committee meeting agreed. *See, e.g.*, Joint Meeting, *supra*, at 24:20-24:28 ("several commentators have read [*McCullen*] as also calling into question the reasoning of *Hill*"); *id.* at 47:31-47:35 ("I think it's true that *Hill* may get overturned."); *id.* at 48:50-48:53 (*Hill* is "on too shaky ground now"); *id.* at 1:40:32-1:41:01 ("The Court might strike it down, which I think if it did take [the case], it's likely that it would, especially given dicta and other statements by justices of what their view is, and given Alito's concurrence [in *McCullen*] and Scalia's dissent in *Hill*. … I think, yes, that the Court would strike it down.").

*Reed*, 576 U.S. at 166. The Sidewalk Counseling Ban is content based under both tests.

*First*, the Sidewalk Counseling Ban is content based on its face. The law by its terms "applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 163. A speaker has to obtain permission to approach within eight feet of a woman outside an abortion clinic only if her intended speech includes certain categories of content—"protest, education, or counseling." If, by contrast, the speaker wishes to approach a woman to engage in speech of any other content—say, to take a poll, solicit donations, ask for directions, or wish good luck—she is free to do so.

Put differently, in enforcing the Sidewalk Counseling Ban, authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (cleaned up). "[D]ivining [the] purpose" of an approach could not be done otherwise. *Price*, 915 F.3d at 1118.

This Court's precedent demonstrates the point. In *Centro de la Comunidad Hispana de Locust Valley*, this Court considered an ordinance forbidding persons "standing within or adjacent to any public right-of-way" from "stop[ping] or attempt[ing] to stop any motor vehicle … for the purpose of soliciting employment of any kind." 868 F.3d at 107. The Court found this law content based. The Court explained that "[a]lthough the

47

Ordinance has a conduct component—the attempted stopping of a vehicle—the Ordinance only punishes such conduct if done 'for the purpose of soliciting employment.'" *Id.* at 112. "Consequently, Town officials must monitor and evaluate the speech of those stopping or attempting to stop vehicles and they may sanction the speaker only if a suspect says the wrong thing, for example, 'hire me' as opposed to 'tell me the time.'" *Id.*

Absent *Hill*, this Court could say exactly the same thing here. Even if the Sidewalk Counseling Ban has "a conduct component"—approaching within eight feet without consent—it "only punishes such conduct if done 'for the purpose of'" protesting, educating, or counseling. *Id.* On its face, that is a content-based restriction. *See Reed*, 576 U.S. at 163 (law that defines "regulated speech by its function or purpose" is facially content based).

*Second*, the Sidewalk Counseling Ban's "purpose and justification" are also content based. *Id.* at 166. Under *McCullen*, if a law is "concerned with undesirable effects that arise" from speech's effect on listeners—such as if its purpose or justification is protecting listeners from "offense or discomfort"—the law is content based. 573 U.S. at 481.

But as *Hill* made clear, the purpose served by laws like the County's is exactly that—protecting abortion-clinic patients from the "potential trauma … associated with confrontational protests." 530 U.S. at 715. After *McCullen*, that is no longer a content-neutral justification for a speech restriction.

48

### 2. The Sidewalk Counseling Ban cannot survive strict, or even intermediate, scrutiny.

As a content-based law, the Sidewalk Counseling Ban triggers strict scrutiny—a "demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see also, e.g.*, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible."). But *McCullen* demonstrates that the Ban cannot survive even intermediate scrutiny, making the strict-scrutiny holding follow *a fortiori. Cf. Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371, 2375 (2018) (declining to decide whether to apply strict scrutiny "because the licensed notice cannot survive even intermediate scrutiny").

To be narrowly tailored, a speech regulation "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen*, 573 U.S. at 486. This inquiry "demand[s] a close fit between ends and means," "prevent[ing] the government from too readily sacrificing speech for efficiency." *Id.* (cleaned up).

In *McCullen*, for example, Massachusetts claimed the buffer zone around abortion clinics "promotes 'public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways.'" *Id.* at 486. Yet it had many "options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *Id.* at 490. And Massachusetts failed to show "it

seriously undertook to address the problem with [these] less intrusive tools" before turning to the challenged restriction. *Id.* at 494.

That analysis is dispositive here. First, the County below gestured at *Hill*'s view that eight feet represents a "normal conversational distance." 530 U.S. at 726-27; *see* App.30. But if eight feet were normal, the County would not have needed to stress in recent years that six feet constituted "social distancing."[7] *Cf. Hill*, 530 U.S. at 756 (Scalia, *J.*, dissenting) ("absurd" to suggest that it is normal for speakers to "walk[] along the public sidewalk … 'conversing' at an 8-foot remove"). In any event, the complaint explains in detail the practical and message-based reasons why it is "essential" for Plaintiff's counseling to "be conducted within eight feet and within arm's reach." App.11-12 ¶53; *see also* App.8 ¶38. And the "First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988).

Meanwhile, as in *McCullen*, the County "has available to it a variety of approaches that appear capable of serving" any legitimate interests in protecting access to abortion clinics and guarding against harassment

---

[7] *Coronavirus Disease 2019 (COVID-19)*, Westchester Cnty. Dep't of Health, https://perma.cc/QV7K-SZ7U; *see also, e.g.*, Dave Zucker, *More Westchester Communities Have Been Designated COVID-19 Micro-Clusters*, Westchester Magazine (Nov. 19, 2020), https://perma.cc/5K98-FP6A (County Executive Latimer: "Wearing a mask and social distancing is not an option—you must do it.").

and violence. 573 U.S. at 493-94. Indeed, the County has available to it many of the *same* options identified by the *McCullen* Court—some appearing in other parts of § 425.31 itself.

For example, the *McCullen* Court noted the Massachusetts statute at issue had a "separate provision" making it a crime to knowingly obstruct or block another's entry to or exit from an abortion clinic. *Id.* at 490-91. So too here—§ 425.31(a) makes it a crime to "knowingly physically obstruct or block another person from entering into or exiting from" an abortion clinic (or its parking lot).

Likewise, the *McCullen* Court said that "[i]f Massachusetts determines that broader prohibitions along the same lines are necessary, it could enact legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (FACE Act)." 573 U.S. at 491. Here, New York State already has a FACE Act analogue of its own. N.Y. Penal Law § 240.70. And the County has followed suit: § 425.31 includes *two* provisions closely tracking the FACE Act and its New York analogue, which if anything only broaden those prohibitions. *Compare* 18 U.S.C. § 248(a)(1) (barring injuring, intimidating, or interfering with persons seeking to obtain or provide abortions, by "by force or threat of force or by physical obstruction"), *and* N.Y. Penal Law § 240.70 (same), *with* Laws of Westchester County § 425.31(e)-(f) (same); *see also* Letter Response at 5, *Hulinsky*, No. 7:22-cv-6950 (Jan. 9, 2023), ECF No. 58 (County acknowl-

edging that "there is no material difference between Chapter 425's prohibitions and definitions and the FACE's (or New York State law's) prohibitions and definitions").

Similarly, *McCullen* also pointed out that "if the Commonwealth is particularly concerned about harassment, it could also consider an ordinance [that] makes it a crime 'to follow and harass another person'" near an abortion clinic. 573 U.S. at 491. The County has done this, too—prohibiting "follow[ing] and harass[ing]" near abortion clinics in § 425.31(c).

Indeed, § 425.31 includes other provisions that go beyond options offered by the *McCullen* Court. Subsection (b) prohibits "unwanted physical contact" near an abortion clinic. Subsection (d) prohibits "knowingly engag[ing] in a course of conduct" that "places another person in reasonable fear of physical harm" near an abortion clinic. Subsection (g) prohibits "physically damag[ing]" an abortion clinic. And subsection (h) prohibits "knowingly interfer[ing] with" (or attempting to interfere with) a clinic's "operation[s]." All these provisions address any County interests in access and safety—and all are "unchallenged by [Plaintiff]" here. *McCullen*, 573 U.S. at 490-91.

And all this says nothing of "generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like." *Id.* at 492; *cf. NIFLA*, 138 S. Ct. at 2377 ("California already makes it a crime for individuals without a medical license to practice medicine."). New York law of course prohibits entering the property of another (including an

abortion clinic) without permission, subjecting that conduct to both civil and criminal penalties. N.Y. Penal Law § 140.10; *see Long Island Gynecological Servs., P.C. v. Murphy*, 298 A.D.2d 504, 74 N.Y.S.2d 776 (2d Dep't 2002) (affirming permanent injunction for trespassing at abortion clinic). And New York has generally applicable criminal statutes forbidding, *inter alia*, assault, N.Y. Penal Law § 120.00; harassment, *id.* §§ 240.25-26; and disorderly conduct, *id.* § 240.20.

The County thus has numerous other ways to punish violent, obstructive, and harassing behavior outside abortion clinics besides a content-based ban on approaching within eight feet. And the County plainly cannot "show[]" that such "other approaches have not worked." *McCullen*, 573 U.S. at 494, 496. For one thing, subsections (a)-(h) of § 425.31 were enacted contemporaneously with the Sidewalk Counseling Ban in subsection (*i*)—so these provisions cannot possibly have been tried and found wanting. "[R]egardless, a 'tepid response' does not prove that [more narrowly tailored action] is not a sufficient alternative." *NIFLA*, 138 S. Ct. at 2376 (quoting *Playboy*, 529 U.S. at 816).

Moreover, according to the Act's committee report, the local incident that allegedly "demonstrate[d] a need" for the Act was a November 2021 trespassing where a Catholic priest and two other pro-life advocates entered a White Plains abortion clinic and remained inside for two hours, despite requests to leave from staff and police. Meeting Agenda, *supra*, at 23; *see also* Matt Spillane, *Men with Red Rose Rescue Found Guilty of*

53

*Trespassing at White Plains Abortion Clinic*, Lohud (Mar. 18, 2022), https://perma.cc/6LP6-8TJF. That incident—which occurred *inside* the clinic, rather than on the public way—was addressed under preexisting criminal trespass law, with the advocates being convicted and sentenced to jail time for their actions. Mike Randall, *Anti-Abortion Activists Sentenced for Trespassing at White Plains Medical Facility*, Lohud (Aug. 3, 2022), https://perma.cc/B6A4-FAWY. There is no indication that other existing laws—the federal FACE Act, the state FACE Act analogue, the County FACE Act analogue, and general criminal prohibitions on violence, harassment, and obstruction—have ever been tried and proved insufficient to address conduct at Westchester abortion clinics.

Given the multitude of other prohibitions available if and when a problem might arise, the only *additional* function served by the Sidewalk Counseling Ban is to prohibit peaceful, non-threatening, non-harassing speech aimed at giving abortion-minded women a final chance to learn more about their options. That may be exactly what the County wants—but it is not permitted by the First Amendment. *McCullen*, 573 U.S. at 477 ("government may not 'selectively … shield the public from some kinds of speech on the ground that they are more offensive than others'").

**3. History and tradition confirm that the Sidewalk Counseling Ban is unlawful.**

Nor is this a case in which "history and tradition" counsel a different result. *City of Austin*, 142 S. Ct. at 1474-75. In *City of Austin*, the Supreme Court upheld as content neutral a law that prohibited the digitization of signs advertising things "not located on the site where the sign is installed"—*e.g.*, billboards. *Id.* at 1468-69. In reaching that conclusion, the Court emphasized that such "[o]n/off-premises distinctions" were part of a "regulatory tradition" stretching back to the late 1860s; that they existed at the federal level and had "proliferated" since at least 1965; and that today "two-thirds of States" and "tens of thousands of municipalities nationwide" have laws analogous to the one challenged there. *Id.* at 1469, 1474-75.

Here, history and tradition cut the opposite direction. The Sidewalk Counseling Ban does not regulate commercial billboards; it regulates peaceful face-to-face speech about important matters on public streets and sidewalks—which have been used "immemorially" for "communicating thoughts between citizens, and discussing public questions." *McCullen*, 573 U.S. at 476. "Such areas occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *Id.* (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)).

Moreover, far from reflecting a century-and-a-half-old tradition, the first *Hill*-style law prohibiting unconsented approaches outside abortion clinics was adopted by the City of Boulder in 1986.[8] Such laws were controversial from the start, with courts repeatedly striking down variations less restrictive of speech. *See Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1215 (9th Cir. 1998) (striking down ordinance permitting abortion-clinic patients to "create" an eight-foot "bubble" zone by "asking the demonstrator to withdraw"); *Sabelko v. City of Phoenix*, 120 F.3d 161 (9th Cir. 1997) (same). And by the time the Court decided *Hill*, it appears Colorado was the *only* state with that type of law. *See generally* Br. Amici Curiae of the State of New York, et al., at 19, *Hill*, 1999 WL 1186258 (Dec. 13, 1999). Today, it appears Montana is the only other state to have followed suit, *see* Mont. Code Ann. § 45-8-110(1), and the local analogues outside Colorado all likewise post-date *Hill*, some by many years, *see, e.g.*, Charleston, W.V., Code § 78-235(c) (2019); Chi., Ill., Code § 8-4-010(j)(1) (2009).

In short, the dearth of "history and tradition of regulation" here, *City of Austin*, 142 S. Ct. at 1475, only confirms the result required by *McCullen* and *Reed*: the Sidewalk Counseling Ban violates the First Amendment.

---

[8]   *Boulder Passes Abortion 'Buffer-Zone' Law*, AP News (Oct. 22, 1986), https://perma.cc/8J7F-EUS5.

**CONCLUSION**

The district court's standing holding should be reversed. Although the district court's merits holding was dictated by *Hill*, *Hill* should be overruled by the Supreme Court.

Respectfully submitted,

/s/ Mark L. Rienzi
Mark L. Rienzi
Joseph C. Davis
Daniel L. Chen
Daniel M. Vitagliano*
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
(202) 955-0095
*mrienzi@becketlaw.org*

*Not admitted to the D.C. bar; admitted to the
N.Y. bar; supervised by licensed D.C. bar members

57

## CERTIFICATE OF COMPLIANCE

This document complies with the requirements of 2d Cir. R. 32.1(a)(4) because it has 13,412 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

February 24, 2023
/s/ Mark L. Rienzi
Mark L. Rienzi

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on February 24, 2023.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CM/ECF system or by other electronic means.


February 24, 2023                    /s/ Mark L. Rienzi
                                     Mark L. Rienzi

# STATUTORY ADDENDUM
## CHAPTER 425
## REPRODUCTIVE HEALTH CARE FACILITIES ACCESS ACT

**Sec. 425.01. Short title.**

**Sec. 425.11. Legislative Intent.**

**Sec. 425.21. Definitions.**

**Sec. 425.31. Prohibited Content.**

**Sec. 425.41. Violations.**

**Sec. 425.51. Civil cause of action.**

**Sec. 425.61. Civil action by County of Westchester.**

**Sec. 425.71. Joint and several liability.**

**Sec. 425.81. Construction.**

**Sec. 425.91. Severability.**

**Sec. 425.01. Short title.**

This title shall be known as and may be cited as the "Reproductive Health Care Facilities Access Act."

**Sec. 425.11. Legislative intent.**

The County Board of Legislators finds that the right to access reproductive health care facilities and the right to obtain reproductive health care services, treatments, and/or procedures are essential personal rights protected by state and federal law. Equally, the right to peaceably protest and express one's views is an essential right protected by state and federal law. Such actions include, but are not limited to, the right to speak,

march, demonstrate, picket, pray, associate with others in expressive behavior, or engage in other activity protected by the First Amendment.

The County Board is aware that there are individuals and/or groups of individuals who may exceed the boundaries of lawful First Amendment expression by engaging in activities that prevent individuals from accessing reproductive health care facilities or obtaining reproductive health care services, treatments, or procedures, or by engaging in activities that unlawfully harass or intimidate individuals trying to access such facilities and services. Such activities unlawfully interfere with both the operators of reproductive health care facilities and all individuals seeking free entrance to and egress from such facilities.

The County Board finds that current law does not adequately protect reproductive health care facilities, and those who work in, seek access to, or obtain services from such facilities. Therefore, the County Board of Legislators has determined that it is appropriate to enact legislation to prohibit interference with accessing reproductive health care facilities and obtaining reproductive health care services, in order to: protect and promote the public health, safety, and welfare; ensure order; protect the freedom of access to reproductive health care facilities; protect the freedom to obtain reproductive health care services; promote the free flow of traffic in the public way; advance medical privacy and the well-being of patients seeking access to reproductive health care facilities and obtaining reproductive health care services; and safeguard private property.

61

This proposed Local Law protects persons seeking access to reproductive health care facilities and services both inside facilities as well as outside said facilities. The County Board finds that this Local Law does not prohibit conduct normally protected by the First Amendment. However, "true threats" and expression that takes place while trespassing on private property are not protected under the First Amendment. The right to engage in legitimate First Amendment activity does not shield individuals who trespass on private property or otherwise run afoul of the law. And to the extent any First Amendment conduct is affected by this Local Law at all, the law acts as a modest and reasonable time, place, and manner restriction that leaves ample room to communicate messages through speech and other protected First Amendment activity.

The County Board has further determined that persons harmed by such interfering conduct should be able to seek redress in the courts, including state courts, for injunctive relief, damages, and attorney's fees and costs, and that the County of Westchester should be able to obtain appropriate injunctive relief under this Local Law.

**Sec. 425.21. Definitions.**

Whenever used in this Chapter, the following words and phrases shall have the meanings indicated, unless the context or subject matter otherwise requires:

    a. "Approach" shall mean to move nearer in distance to someone.
    b. "Eight (8) feet" shall be measured from the part of a person's body that is nearest to the closest part of another person's

body, where the term "body" includes any natural or artificial extension of a person, including, but not limited to, an outstretched arm or handheld sign.

c. "Harass" shall mean to engage in a course of conduct or repeatedly commit conduct or acts that alarm or seriously annoy another person and which serve no legitimate purpose. For the purposes of this definition, conduct or acts that serve no legitimate purpose include, but are not limited to, conduct or acts that continue after an express or implied request to cease has been made.

d. "Interfere with" shall mean to restrict a person's freedom of movement, or to stop, obstruct, or prevent, through deceptive means or otherwise.

e. "Intimidate" shall mean to place a person in reasonable apprehension of physical injury to such person or to another person.

f. "Invitee" shall mean an individual who enters another's premises as a result of an express or implied invitation of the owner or occupant for their mutual gain or benefit.

g. "Person" shall mean an individual, corporation, not-for-profit organization, partnership, association, group, or any other entity.

h. "Physically obstruct or block" shall mean to physically hinder, restrain, or impede, or to attempt to physically hinder, restrain or impede, or to otherwise render ingress to or egress from, or render passage to or from the premises of a reproductive health care facility impassable, unreasonably difficult, or hazardous.

i. "Premises of a reproductive health care facility" shall include the driveway, entrance, entryway, or exit of the reproductive health care facility, the building in which such facility is located, and any parking lot in which the facility has an ownership or leasehold interest.

j. "Public parking lot serving a reproductive health care facility" shall mean any public parking lot that serves a reproductive health care facility and that has an entrance or exit located within one-hundred (100) feet of any door to that reproductive health care facility.

k. "Reproductive health care facility" shall mean any building, structure, or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide reproductive health care services.

l. "Reproductive health care services" shall mean medical, surgical, counseling, or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.

## Sec. 425.31. Prohibited conduct.

It shall be unlawful for any person to do the following:

a. knowingly physically obstruct or block another person from entering into or exiting from the premises of a reproductive health care facility or a public parking lot serving a reproductive health care facility, in order to prevent that person from obtaining or rendering, or assisting in obtaining or rendering, medical treatment or reproductive health care services; or

b. strike, shove, restrain, grab, kick, or otherwise subject to unwanted physical contact or injury any person seeking to legally enter or exit the premises of a reproductive health care facility; or

c. knowingly follow and harass another person within twenty-five (25) feet of (i) the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

d. knowingly engage in a course of conduct or repeatedly commit acts when such behavior places another person in reasonable fear of physical harm, or attempt to do the same, within twenty-five (25) feet of (i) the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

e. by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, another person in order to discourage such other person or any other person or persons from obtaining or providing, or assisting in obtaining or providing, reproductive health care services; or

64

f. by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate or interfere with, another person because such person was or is obtaining or providing, or was or is assisting in obtaining or providing, reproductive health care services; or

g. physically damage a reproductive health care facility so as to interfere with its operation, or attempt to do the same; or

h. knowingly interfere with the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, interfering with, or attempting to interfere with (i) medical procedures or treatments being performed at such reproductive health care facility; (ii) the delivery of goods or services to such reproductive health care facility; or (iii) persons inside the facility; or

i. knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility.

## Sec. 425.41. Violations.

a. Any person who shall violate any provision of section 425.31 shall be guilty of a misdemeanor, punishable by a fine not to exceed one thousand dollars ($1,000), or imprisonment not to exceed six (6) months, or both, for a first conviction under section 425.31; and

b. For a second and each subsequent conviction under section 425.31, the penalty shall be a fine not to exceed five thousand dollars ($5,000), or imprisonment not to exceed one (1) year, or both.

65

**Sec. 425.51. Civil cause of action.**

Where there has been a violation of section 425.31, any person whose ability to access the premises of a reproductive health care facility has been interfered with, and any owner or operator of a reproductive health care facility or owner of a building in which such facility is located, and any employee, paid or unpaid, and any volunteer working for such facility, and any invitee, may bring a civil action in any court of competent jurisdiction, within five years of such violation, for any or all of the following relief: injunctive relief; actual damages suffered as a result of such violation, including, where applicable, pain and suffering, psychological, and emotional distress damages; treble the amount of actual damages suffered as a result of such violation; and attorney's fees and costs.

**Sec. 425.61. Civil action by County of Westchester.**

The County Attorney may bring a civil action on behalf of the County, in accordance with the provisions of Sec. 158.11(3) of the Laws of Westchester County, in any court of competent jurisdiction for injunctive and other appropriate equitable relief in order to prevent or cure a violation of section 425.31.

**Sec. 425.71. Joint and several liability.**

If it is found, in any action brought pursuant to the provisions of this chapter, that two (2) or more of the named defendants acted in concert pursuant to a common plan or design to violate any provision of section

425.31, such defendants shall each be held jointly and severally liable for any fines or penalties imposed or any damages, costs, and fees awarded.

### Sec. 425.81. Construction.

a. No provision of this chapter shall be construed or interpreted so as to limit the right of any person or entity to seek other available criminal penalties or civil remedies, including either the Attorney General for the State of New York or the District Attorney for the County of Westchester.

b. No provision of this chapter shall be construed or interpreted so as to prohibit expression protected by the First Amendment of the Constitution of the United States or section eight of article one of the Constitution of the State of New York.

c. No provision of this chapter shall be construed or interpreted so as to limit the lawful exercise of any authority vested in the owner or operator of a reproductive health care facility, the owner of the premises in which such a facility is located, or a law enforcement officer of Westchester County or of any municipality within Westchester County, or of New York State or the United States, acting within the scope of such person's official duties.

### Sec. 425.91. Severability.

If any clause, sentence, paragraph, section, or part of this Local Law shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section, or part thereof directly involved in the controversy in which such judgment shall have been rendered.