# 23-30

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

DEBRA A. VITAGLIANO,

*Plaintiff - Appellant*,

v.

COUNTY OF WESTCHESTER,

*Defendant-Appellee*,

GEORGE LATIMER, GEORGE LATIMER, IN HIS OFFICIAL CAPACITY AS COUNTY EXECUTIVE OF THE COUNTY OF WESTCHESTER, JOHN M. NONNA, JOHN M. NONNA, IN HIS OFFICIAL CAPACITY AS COUNTY ATTORNEY OF THE COUNTY OF WESTCHESTER,

*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York, No. 7:22-cv-9370

## BRIEF OF *AMICI CURIAE* WESTCHESTER COALITION FOR LEGAL ABORTION – CHOICE MATTERS, INC., HOPE'S DOOR, WESTCHESTER WOMEN'S AGENDA, AND PLANNED PARENTHOOD HUDSON PECONIC, INC. IN SUPPORT OF DEFENDANT-APPELLEE

MORGAN, LEWIS & BOCKIUS LLP

Caiti Zeytoonian*
One Federal Street
Boston, MA 02110
(617) 341-7724

Bichnga T. Do*
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071
(213) 612-2657

Stephanie Schuster
Emily Booth
Tanya Tiwari*
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 373-6595

*pro hac vice* application pending

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* state the following: (i) Westchester Coalition for Legal Abortion – Choice Matters, Inc. is a 501(c)(4) non-profit, tax-exempt organization that has no parent corporation, and no publicly held corporation owns ten percent or more of its stock; (ii) Hope's Door is a 501(c)(3) non-profit charity that has no parent corporation, and no publicly held corporation owns ten percent or more of its stock; (iii) Westchester Women's Agenda is an unincorporated association that has no parent corporation, and no publicly held corporation owns ten percent or more of its stock; and (iv) Planned Parenthood Hudson Peconic, Inc. is a 501(c)(3) organization that has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ............................................................. 1

INTRODUCTION ..................................................................................... 5

ARGUMENT ............................................................................................ 7

   I.   BUFFER ZONE LAWS ARE CRITICAL FOR WOMEN
       SEEKING REPRODUCTIVE HEALTH SERVICES. ............................ 7

      A.   Buffer Zone Laws Protect Women Seeking Reproductive
           Health Services From Physical And Psychological Harm.................. 8

      B.   Buffer Zone Laws Protect Survivors Of Domestic Violence
           And Intimate Partner Violence From Further Traumatization .......... 10

  II.  Plaintiff's Claim Would Fail Even If She Were Successful In
      Obtaining Supreme Court Review And Persuading The Court
      To Overrule *Hill* ....................................................................... 13

  II.  Plaintiff Lacks Article III Standing.......................................... 17

CONCLUSION ....................................................................................... 19

# TABLE OF AUTHORITIES

CASES

*Adam v. Barr*,
   792 F. App'x 20 (2d Cir. 2019) ............................................................................18

*Bruni v. City of Pittsburgh*,
   941 F.3d 73 (3d Cir. 2019) ...................................................................................15

*Calcano v. Swarovski Ltd.*,
   36 F.4th 68 (2d Cir. 2022) ..............................................................................17, 18

*Harty v. W. Point Realty, Inc.*,
   28 F.4th 435 (2d Cir. 2022) ..................................................................................18

*Hill v. Colorado*,
   530 U.S. 703 (2000).........................................................................................5, 13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................................6, 17, 18

*McCullen v. Coakley*,
   573 U.S. 464 (2014).................................................................................13, 15, 17

*McGuire v. Reilly*,
   260 F.3d 36 (1st Cir. 2001) ...................................................................................16

*Phelps-Roper v. City of Manchester*,
   697 F.3d 678 (8th Cir. 2012) .................................................................................16

*Price v. City of Chicago*,
   915 F.3d 1107 (7th Cir. 2019) ...............................................................................16

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).......................................................................................17, 18

*Veneklase v. City of Fargo*,
   248 F.3d 738 (8th Cir. 2001) .................................................................................16

STATUTE

Colo. Rev. Stat. § 18-9-122(4)....................................................................................14

## OTHER AUTHORITIES

American College of Obstetricians & Gynecologists, *Issue Brief: Crisis Pregnancy Centers* (Oct. 2022) ...................................................14, 15

Ann M. Moore, et al., *Male reproductive control of women who have experienced intimate partner violence in the United States*, 70 SOC. SCI. & MED. 1737 (2010) ...........................................................................10

Catherine Cozzarelli & Brenda Major, *The Effects of Anti-abortion Demonstrators and Pro-Choice Escorts on Women's Psychological Responses to Abortion*, 13 J. OF SOC. & CLINICAL PSYCH. 404 (1994) ..............9

Christina C. Pallitto, et al., *Intimate partner violence, abortion, and unintended pregnancy: Results from the WHO Multi-country Study on Women's Health and Domestic Violence*, 120 INT'L J. OF GYNECOLOGY & OBSTETRICS 3 (2013) ................................................................10, 11

D.G. Foster, et al., *Effect of abortion protesters on women's emotional response to abortion*, 87 CONTRACEPTION 81 (2013)...........................................8

Erin Carroll & Kari White, *Women's Experiences with Protestors while Accessing Abortion Care in La.*, UNIV. OF TEX. AT AUSTIN POPULATION RSCH. CTR. (2019)...........................................................................7, 11

Gillian Aston & Susan Bewley, *Abortion & domestic violence*, 11 THE OBSTETRICIAN & GYNAECOLOGIST 163 (2009) ..................................................12

Office on Women's Health, *Domestic or intimate partner violence*, U.S. DEP'T OF HEALTH & HUMAN SERVS. ...................................................................8

Warren M. Hern, *Proxemics: The Application of Theory to Conflict Arising from Antiabortion Demonstrations*, 12 POPULATION & ENVIRONMENT: A J. OF INTERDISCIPLINARY STUDIES 379 (1991) ...................................................9

iv

## <u>INTEREST OF *AMICI CURIAE*[1]</u>

Westchester Coalition for Legal Abortion - Choice Matters, Inc. ("Choice Matters") is a non-profit social welfare organization, exempt from federal income tax under Internal Revenue Code section 501(c)(4). Founded in 1972, Choice Matters is dedicated to the advancement and protection of full, unimpeded access to comprehensive reproductive health care for all. To that end, Choice Matters endeavors to protect the right of women to have a legal abortion, ensure access to abortion services, and prevent constitutional amendments, laws, and administrative regulations that impede access to timely abortion services or restrict reproductive choices. In furtherance of its mission, Choice Matters supports the advancement of sound policy and legislation on local, state, and federal levels and actively opposes policy and legislation that would have the effect of restricting access to legal abortion services for any woman or group of women.

Hope's Door is a non-profit social welfare organization, exempt from federal income tax under IRC section 501(c)(3). Hope's Door seeks to end domestic violence and empower survivors to achieve safety, independence, and healing from abuse. For over 40 years, Hope's Door has provided comprehensive services to

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

survivors of domestic violence. Hope's Door recognizes that unfettered access to reproductive health care services and free reproductive decision making are particularly vital needs for survivors of domestic violence. Abusers commonly use physical, sexual, emotional, psychological, and financial abuse to control their victims. Survivors of domestic violence have also reported instances of "reproductive coercion," in which abusers engage in threats or acts of violence against their victim's reproductive health or reproductive decision making, such as forced sex or interference with birth control use. The issue of safe access to reproductive health care facilities thus directly impacts survivors of domestic violence, including those served by Hope's Door.

Westchester Women's Agenda ("WWA") is an unincorporated association that advocates on behalf of women in Westchester County, New York. Its members include 50 non-profit organizations and over 100 individuals who collectively work to advance policies and legislation that support social and economic equality for women, including access to reproductive health care.

Planned Parenthood Hudson Peconic, Inc. ("PPHP") is a IRC section 501(c)(3) organization that provides a wide range of much-needed sexual and reproductive health care services at four locations in Westchester County, NY: Mount Vernon, New Rochelle, White Plains, and Yonkers. In 2022, PPHP provided care to nearly 15,000 patients through 22,000 visits. Its services include birth control,

emergency contraception, prevention, testing, and treatment for sexually transmitted infections, HIV testing, counseling, and treatment, PrEP and PEP for HIV prevention, prenatal care, gynecological care, abortion care, vasectomy care, gender affirming care, HPV vaccination, cancer screenings, menopause management, and more. While abortion care is only one of many services PPHP provides, it is the focus of considerable hostility toward everyone who enters PPHP's facilities. PPHP's top priorities are the physical and mental well-being of its patients and staff, which will be protected by the buffer zone law challenged by Plaintiff.

*Amici* share a commitment to safeguarding access and the legal right to reproductive health and autonomy, including the right to choose to terminate a pregnancy. *Amici* have a strong interest in this case and in the affirmance of the District Court's decision. *Amici* regularly serve and advocate for women in need of services provided at local reproductive health care facilities, including access to sexual health information, contraception, care for continuing pregnancies, and access to legal abortions. By placing restrictions on the place and manner by which people can engage in speech outside of reproductive health care facilities, Westchester County Law Chapter 425, the Reproductive Health Care Facilities Access Act, establishes a secure space around clinic facilities for staff and patients as well as a proper zone for First Amendment speech. The District Court's ruling, which should be adopted by this Court, maintains the balance between protected

First Amendment speech and the rights of individuals to safely access reproductive health care facilities. Accordingly, *Amici* submit this brief to aid the Court in its understanding of the issues presented and the adverse impact reversing the decision below would have on women seeking reproductive health care services in Westchester County, and beyond.

## **INTRODUCTION**

*Amici* submit this brief to amplify the voices of women seeking safe access to abortion services. Chapter 425 of the Laws of Westchester County (the "Westchester Law") is critical to achieving this goal. The Westchester Law creates a "buffer zone" to protect women's physical ability to access reproductive health care services, as well as their privacy when doing so. The Westchester Law's buffer zone is especially important to protecting women who are survivors of domestic violence or intimate partner violence—who represent a significant portion of the population who make the difficult decision to terminate a pregnancy—from suffering additional trauma and abuse when attempting to enter a health care facility. The buffer zone further protects the health care providers and other employees that serve these facilities.

The Westchester Law correctly maintains the careful balance between protecting speech and safeguarding the rights of women to safely and privately access reproductive health care facilities. As Plaintiff concedes, the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703 (2000), compels the conclusion that the Westchester Law comports with the First Amendment. Plaintiff's attempt to overturn *Hill* through this case must fail for two reasons.

*First*, even if *Hill* were put aside, the Westchester Law is constitutional under established First Amendment principles. It is a content-neutral place and manner restriction that is subject to intermediate scrutiny. Indeed, by its plain terms, the

Westchester Law applies equally to anti-choice speech outside reproductive health clinics offering abortion care as well as pro-choice speech outside crisis pregnancy centers that advocate against abortion.

The Westchester Law passes intermediate scrutiny: the 8-foot buffer within a 100-foot radius of the facility (which applies only if there is *not* consent) is narrowly tailored to further significant governmental interests in protecting the safety and privacy of individuals seeking reproductive health care services. Further, were the Westchester Law subject to strict scrutiny, it would survive because it is the least restrictive means to protect the safety of patients and employees of reproductive health care facilities.

*Second*, as the District Court held, Plaintiff lacks Article III standing. Plaintiff does not allege a sufficiently concrete or imminent injury because, although she claims she wants to engage in conduct the Westchester Law may prohibit at some unspecified point in the future, she does not allege any facts establishing when that future day may be. As the Supreme Court has long held, such "some day" intentions are insufficient to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The District Court's judgment should be affirmed.

## ARGUMENT

## I. BUFFER ZONE LAWS ARE CRITICAL FOR WOMEN SEEKING REPRODUCTIVE HEALTH SERVICES.

The Westchester Law is critical to "protect[ing] the dignity, privacy, and safety of patients accessing [reproductive health] care."[2] Plaintiff asserts that the Westchester Law is not related to "maintaining clinic access or avoiding violence." Pl. Br. 2. That is inaccurate. The County's express intent was to prevent harassment, intimidation, and activities that "unlawfully interfere with both the operators of reproductive health care facilities and all individuals seeking free entrance to and egress from" reproductive health care facilities, Westchester Cnty. Laws § 425.11.

Without buffer zones (also called "bubble zones") like the one created by the Westchester Law, anti-choice protestors physically interfere with a patient's ability to access reproductive health care services.[3] At clinics without these protective zones, relentless—and often intimidating—anti-choice protestors gather outside to block sidewalks, entrances, and access to parking lots.[4] Protestors' physical interference is compounded by the negative impact they have on the psychological

---

[2]     Erin Carroll & Kari White, *Women's Experiences with Protestors while Accessing Abortion Care in La.*, UNIV. OF TEX. AT AUSTIN POPULATION RSCH. CTR. (2019), https://repositories.lib.utexas.edu/bitstream/id/306f2b00-ea9a-497e-b950-19b75a9dc462/prc-brief-4-13-carroll-white-LA-protestors.pdf          ("*Women's Experiences with Protestors*").

[3]     *Id.*

[4]     *Id.*

and physical health of the women seeking care, particularly survivors of domestic and intimate partner violence.[5] Through this lawsuit, Plaintiff seeks to invalidate not only the Westchester Law, but all laws like it across the country, to the detriment of women seeking access to reproductive health care facilities.

### A. Buffer Zone Laws Protect Women Seeking Reproductive Health Services From Physical And Psychological Harm.

Anti-choice protestors exacerbate the distress experienced by women who make the difficult decision to terminate a pregnancy.[6] For some women, interactions with anti-choice protestors are themselves "traumatic."[7] That distress may manifest psychologically or physically.

Importantly, the more aggressive the "sidewalk counseling" from anti-choice protestors such as Plaintiff, the more likely it becomes that such interactions will inflict psychological harm. One study showed that a woman encountering "more

---

[5]    Domestic violence refers to physical, sexual or emotional abuse by a cohabitant, whereas intimate partner violence includes "physical, sexual, or emotional abuse, as well as sexual coercion and stalking by a current or former intimate partner." Office on Women's Health, *Domestic or intimate partner violence*, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.womenshealth.gov/relationships-and-safety/domestic-violence.

[6]    D.G. Foster, et al., *Effect of abortion protesters on women's emotional response to abortion*, 87 CONTRACEPTION 81, 85 (2013), https://www.contraceptionjournal.org/article/S0010-7824(12)00815-3/fulltext.

[7]    *Id.*

8

intense anti-abortion activity" at a reproductive health care facility is more likely to report depression.[8]

Providers have attested to witnessing the physical effects of anti-abortion harassment: "In addition to crying, patients exhibited evidence of adrenergic 'fight-or-flight' reaction such as pallor, shaking, sweating, papillary dilation, palpitations, hyperventilation, and urinary retention."[9] These reactions can cause serious medical complications that are otherwise unlikely to occur.[10]

There is a clear, documented correlation between harassment from anti-choice protestors and worse psychological and physical outcomes for women seeking reproductive health care. It is, therefore, reasonable and necessary to put minimal distance between protestors and the women they target. The Westchester Law's eight-foot buffer around a person seeking care reduces the harm inflicted by harassment from anti-choice protestors.

---

[8] Catherine Cozzarelli & Brenda Major, *The Effects of Anti-abortion Demonstrators & Pro-Choice Escorts on Women's Psychological Responses to Abortion*, 13 J. OF SOC. & CLINICAL PSYCH. 404, 404 (1994).

[9] Warren M. Hern, *Proxemics: The Application of Theory to Conflict Arising from Antiabortion Demonstrations*, 12 POPULATION & ENVIRONMENT: A J. OF INTERDISCIPLINARY STUDIES 379–88 (1991).

[10] *Id.*

**B.      Buffer Zone Laws Protect Survivors Of Domestic Violence And Intimate Partner Violence From Further Traumatization.**

Domestic violence and intimate partner violence are associated with a number of negative reproductive health outcomes, including "unwanted pregnancy, women not using their preferred contraceptive method, sexually transmitted infections including HIV/AIDS, miscarriages, repeat abortion, a high number of sexual partners, and poor pregnancy outcomes."[11] Abusers use coercive control to inflict unwanted pregnancies on survivors, or conversely, physical abuse upon learning of a pregnancy.[12] As a result, a significant number of the patients seeking to terminate a pregnancy at the reproductive health care facilities protected by buffer zone laws, like the Westchester Law, likely are and will be survivors of domestic violence or intimate partner violence. Research bears this out:

- An English study revealed that "more than one in three abortion-seeking women had experienced lifetime domestic violence."[13]

---

[11]      Ann M. Moore, et al., *Male reproductive control of women who have experienced intimate partner violence in the United States*, 70 SOC. SCI. & MED. 1737 (2010).

[12]      *Id.*

[13]      Christina C. Pallitto, et al., *Intimate partner violence, abortion, and unintended pregnancy: Results from the WHO Multi-country Study on Women's Health & Domestic Violence*, 120 INT'L J. OF GYNECOLOGY & OBSTETRICS 3 (2013), https://www.sciencedirect.com/science/article/abs/pii/S0020729212003980 ("Women with a history of [intimate partner violence] had significantly higher odds of unintended pregnancy in 8 of 14 sites and of abortion in 12 of 15 sites.").

- A study of abortion clinics in China showed that "22.6% [of patients] had experienced domestic violence during their lifetime."[14]

- Another study found that "[r]epeat abortion was statistically significantly higher in abused women compared with the nonabused group."[15]

- A Canadian study found that women seeking abortions "reported rates of domestic violence nearly three times higher" than those that continued their pregnancies, and that the "risk of being a victim of physical and/or sexual violence in the preceding year was almost four times higher … in the abortion group."[16]

- A study of women seeking a subsequent abortion found that (i) such women "were more likely to have experienced physical abuse by a male partner, sexual abuse or coercion"; (ii) of "women presenting for a first abortion, 24% reported a major conflict and fights with the man involved in the pregnancy"; (iii) "30% of women having a second abortion reported relationship violence"; and (iv) "women having a third or subsequent abortion were 2.5 times as likely to report a history of physical or sexual abuse by a male partner."[17]

The Westchester Law uniquely protects survivors of domestic violence and intimate partner violence because it provides privacy and discretion for survivors seeking health services without the knowledge of their abusers. Women visiting reproductive health clinics are often "worried that their decision to get an abortion would not remain as private as they would like because of protestors' presence."[18]

---

[14]  *Id.*

[15]  *Id.*

[16]  *Id.*

[17]  *Id.*

[18]  *Women's Experiences with Protestors*, supra note 2.

In part, these fears stem from repeat abuse. One study "showed that 17.2% of women concealed terminations from their partners."[19] While "7.9% reported direct fear of physical harm as the primary reason" for nondisclosure, the rate at which these women experienced "physical and sexual abuse was twice as high" as women who disclosed to their partners.[20] Buffer zones offer survivors privacy to seek pregnancy termination and other reproductive health care services without the knowledge of their abusers.

\*      \*      \*

Buffer laws like the Westchester Law not only protect women's access to reproductive health care facilities—they also protect women who face domestic violence and/or intimate partner violence from further trauma. Keeping protesters like Plaintiff eight feet away is critical to survivors' physical and mental health when they attempt to access health care facilities. Because it is impossible to identify or distinguish the myriad challenging issues individuals are enduring as they enter these facilities, the Westchester Law's content-neutral place and manner restrictions provide a reasonable level of protection while also ensuring the First Amendment rights of all.

---

[19]  Gillian Aston & Susan Bewley, *Abortion & domestic violence*, 11 THE OBSTETRICIAN AND GYNAECOLOGIST 163, 165 (2009).
[20]  *Id.*

## II. PLAINTIFF'S CLAIM WOULD FAIL EVEN IF SHE WERE SUCCESSFUL IN OBTAINING SUPREME COURT REVIEW AND PERSUADING THE COURT TO OVERRULE *HILL*.

Plaintiff's First Amendment challenge to the Westchester Law is foreclosed by *Hill v. Colorado*, 530 U.S. 703 (2000), where the Supreme Court upheld a similar 8-foot buffer law. *See id.* at 707. Plaintiff does not deny this. Nor has Plaintiff made any secret about her intent to use this lawsuit to try to get *Hill* overturned. *See, e.g.*, Pl. Br. 33 ("On the merits, the district court was right that this case is (for now) controlled by *Hill*."). That effort is misplaced in this case. As explained below, the Westchester Law withstands all challenges under intermediate scrutiny and even strict scrutiny.

Content-neutral restrictions on speech are subject to intermediate scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). In an effort to make the Westchester Law appear content-based, Plaintiff mischaracterizes it as applying to speech around "abortion clinics" only. Pl. Br. 10. That is not what the law says.

By its plain terms, the Westchester Law does not target any particular speech. It regulates the place and manner of speech, prohibiting a person from "knowingly approach[ing] another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling … in the public way" within 100 feet of "*a reproductive health care facility*." Westchester

Cnty. Laws § 425.31(i) (emphasis added). The Westchester Law's broad definition of "reproductive health care facility" includes both clinics such as Planned Parenthood and what are known as "crisis pregnancy centers"—facilities where staff attempt to intimidate women seeking to terminate their pregnancies into carrying a blastocyst or embryo to term.[21] *See id.* § 425.21(k) ("reproductive health care facility" means "any building, structure, or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide reproductive health care services"); *see also id.* § 425.21(l) (defining "reproductive health care services" to include all "medical, surgical, *counseling, or referral services* relating to the human reproductive system, including services relating to *pregnancy* or the termination of a pregnancy") (emphases added).[22]

True reproductive health clinics provide low-cost and no-cost critical care to patients: cancer screenings, gynecological services, and contraceptive counseling, to name a few. *See, e.g.*, *supra*, pp. 2–3. "Crisis pregnancy centers" provide none of those services and instead "aim to dissuade people from accessing certain types of

---

[21]    American College of Obstetricians & Gynecologists, *Issue Brief: Crisis Pregnancy Centers* (Oct. 2022), https://www.acog.org/-/media/project/acog/acogorg/files/advocacy/cpc-issue-brief.pdf?la=en&hash=0E118FA8C462E25F8BE5DF9506941BBA ("CPC Issue Brief").

[22]    In this respect, the Westchester Law is unique. *Compare* Colo. Rev. Stat. § 18-9-122(4) (defining "health care facility" as "any *entity* that is licensed, certified, or otherwise authorized or permitted by law to administer medical treatment in this state") (emphasis added).

reproductive health care, including abortion care and even contraceptive options."[23] Yet, as written, the Westchester Law applies *equally* to anti-choice activities performed outside of true reproductive health clinics and pro-choice activities performed outside of "crisis pregnancy centers." Which is to say, the Westchester Law is content-neutral, so intermediate scrutiny applies.

Intermediate scrutiny demands a law that is narrowly tailored to serve a significant governmental interest. *See McCullen*, 573 U.S. at 486. The County's stated purpose in enacting the Westchester Law is to "protect and promote the public health, safety, and welfare; ensure order; protect the freedom of access to reproductive health care facilities; protect the freedom to obtain reproductive health care services; promote the free flow of traffic in the public way; advance medical privacy and the well-being of patients seeking access to reproductive health care facilities and obtaining reproductive health care services; and safeguard private property." Westchester Cnty. Laws § 425.11. Maintaining safe access to reproductive health care *and* protecting the physical and mental health of women and survivors of domestic violence and intimate partner violence serve a compelling governmental interest: the health and safety of its citizens. *See supra*, Section I.

The Westchester Law is *more* narrowly tailored and *less* restrictive than buffer laws upheld by other circuits. *See, e.g.*, *Bruni v. City of Pittsburgh*, 941 F.3d 73, 88-

---

[23]     CPC Issue Brief, *supra* note 21.

91 (3d Cir. 2019) (holding that city ordinance creating 15-foot buffer zone is "narrowly tailored to serve a significant governmental interest" and "satisfies intermediate scrutiny"); *Price v. City of Chicago*, 915 F.3d 1107, 1117-19 (7th Cir. 2019) (holding Chicago's 8-foot buffer zone was narrowly tailored); *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 694 (8th Cir. 2012) (upholding an ordinance that limits protest within 300 feet of funeral services for 1 hour before and after the event); *McGuire v. Reilly*, 260 F.3d 36, 49 (1st Cir. 2001) (prohibiting approach without consent within 6 feet of person or vehicle within an 18-foot radius of any entrance to a reproductive health care facility); *Veneklase v. City of Fargo*, 248 F.3d 738, 744–45 (8th Cir. 2001) (barring picketing outside dwellings).

Indeed, Plaintiff admits that she could both abide by the law and engage in the "counseling" she wants were she to "raise or amplify her voice at women from eight feet away or to request explicit consent to approach to discuss abortion and to pass literature."[24] Pl. Br. 10. That Plaintiff asserts the need for consent to approach women prevents her from being able to "*effectively* carry out her intended ministry," *id.* (emphasis added), does not speak to tailoring because, as Plaintiff concedes, she can shout at women without their consent as long as she stays 8 feet away.

---

[24] The Westchester Law equally enables Plaintiff to perform this "counseling" for women entering a crisis pregnancy center from 8 feet away or with consent, should she desire to do so.

In any event, even if the Westchester Law were not content neutral and is thus subject to strict scrutiny, it still survives because it is the least restrictive means for achieving the government's interest. While the Court in *McCullen* worried that the government had "too readily forgone options that could serve its interests just as well," *McCullen,* 573 U.S. at 490, Westchester County weighed various options prior to enacting the challenged law. The County specifically found that existing laws did not "adequately protect reproductive health care facilities, and those who work in, seek access to, or obtain services from such facilities." Westchester Cnty. Laws § 425.11. The County created a buffer zone to protect its citizens while providing "ample room to communicate messages through speech and other protected First Amendment activity." *Id.*

## III.    PLAINTIFF LACKS ARTICLE III STANDING.

The District Court's decision should also be affirmed because Plaintiff's complaint suffers from fundamental standing problems. Plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Calcano v. Swarovski Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022). Article III standing demands an injury that is concrete, particularized, and actual or imminent; conjectural or hypothetical future harms are insufficient. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The mere existence of a law prohibiting intended conduct

does not automatically confer Article III standing." *Adam v. Barr*, 792 F. App'x 20, 21–22 (2d Cir. 2019) (citing *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015)).

Where, as here, Plaintiff asserts an injury based only on an alleged threat of prosecution, the alleged threat must be "sufficiently imminent." *Id.* at 159. To meet this standard, Plaintiff needed to allege facts that plausibly suggest (i) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (ii) "intended future conduct" that is "arguably proscribed by [the] statute" challenged; and (iii) "a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159–62 (cleaned up). Plaintiff's allegations falter most prominently on the second element.

An alleged future injury is neither sufficiently imminent nor concrete when the Plaintiff merely alleges that such an injury might occur "some day" in the future. *Lujan*, 504 U.S. at 564. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [is] required" by Article III. *Id.* (emphasis in original); *accord Calcano*, 36 F.4th at 77–78 ("[A] mere profession of an intent to return to the places … is not enough to establish standing.") (cleaned up); *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) (allegation that plaintiff would suffer injury "in the near future" is "not sufficiently

imminent to create an injury in fact"). The District Court correctly held Plaintiff fails to plausibly allege "any concrete plans" to sidewalk counsel at any specific "point in the future." App. 40. Plaintiff does not allege *when*, if ever, she plans to engage in nonconsensual sidewalk counseling within 8 feet of her target—the conduct the Westchester Law prohibits. Plaintiff's alleged injury is therefore neither concrete nor sufficiently imminent to satisfy Article III.

<strong><u>CONCLUSION</u></strong>

The District Court's judgment should be affirmed.

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

Dated: April 7, 2023

s/ Stephanie Schuster
Stephanie Schuster
Emily Booth
Tanya Tiwari*
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 373-6595
stephanie.schuster@morganlewis.com
emily.booth@morganlewis.com
tanya.tiwari@morganlewis.com

Caiti Zeytoonian*
One Federal Street
Boston, MA 02110
(617) 341-7724
caiti.zeytoonian@morganlewis.com

Bichnga T. Do*
300 South Grand Avenue, 22nd Fl.
Los Angeles, CA 90071

(213) 612-2657
nga.do@morganlewis.com

*pro hac vice* application pending

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Cir. R. 29.1(c) because this brief contains 3,942 words (according to the Microsoft 365 Word count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 Word in 14-point Times New Roman type for text and footnotes.

<u>s/ Stephanie Schuster                </u>
Stephanie Schuster